**Engin YESIL, Petitioner,**

v.

**Janet RENO, Attorney General, et al., Respondents.**

No. 96 Civ. 8409 (DC).

United States District Court, S.D. New York.

Feb. 27, 1997.

Michael P. DiRaimondo, Marialaina L. Masi, New York City and Thomas E. Moseley, Newark, NJ, for Petitioner.

Mary Jo White, United States Attorney for the Southern District of New York by Diogenes P. Kekatos, Pierre M. Gentin, Assistant United States Attorneys, James A. O'Brien, III, Special Assistant United States Attorney, New York City, for Respondents.

Lucas Guttentag, Lee Gelernt, Laura L. Ho, New York City, for amicus curiae American Civil Liberties Union Foundation, Immigrants' Rights Project.

## OPINION

CHIN, District Judge.

Section 212(c) of the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1182(c), gives the Attorney General of the United

States the discretion to waive deportation of certain aliens who are deportable because they have been convicted of a crime. Section 212(c) is a "humane provision" intended to give the Attorney General the ability, in essence, to forgive an individual who has made a serious mistake, but who is deserving of a second chance to remain in the United States because of ameliorating circumstances, including long-standing ties to this country.

Petitioner Engin Yesil ("Yesil") would seem to be such an individual. Although he made a serious mistake by aiding and abetting the distribution of cocaine in 1987, he would seem to be deserving of the second chance contemplated by section 212(c) because he has more than paid his debt to society. He acknowledged his wrongdoing, pled guilty, and served his sentence. At great risk to his life and safety, he cooperated with law enforcement authorities and infiltrated a cocaine and heroin organization. His efforts led to a number of arrests and the seizure of kilograms of drugs. He has also led a productive life in the United States. He has family and strong ties here. He started a company in Florida that evolved into a thriving business with some 250 employees. He has been in the country now for approximately 18 years—including almost ten years as a lawful permanent resident.

Notwithstanding these compelling circumstances, Yesil was not even considered for a waiver of deportation under section 212(c) because, in the deportation proceedings below, the Immigration Judge (the "IJ") and the Board of Immigration Appeals (the "BIA") declared him ineligible, applying reasoning that the Second Circuit rejected some 20 years ago. Consequently, Yesil filed the present petition for a writ of habeas corpus, seeking relief from the BIA's final decision ordering him deported.

The Government opposes the petition with a veritable arsenal of procedural, jurisdictional, and substantive defenses, including lack of personal jurisdiction, the abuse of writ doctrine, and lack of subject matter jurisdiction. With inexplicable fervor, the Government contends on the merits that Yesil's petition is "frivolous"—even though there is Second Circuit law squarely supporting his position, and even though one member of the BIA dissented from the decision below. Moreover, relying on the recently enacted Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (the "AEDPA"), the Government argues that Yesil may be stripped, without any opportunity for judicial review, of his fundamental right to remain in this country. Indeed, the Government maintains that legal permanent residents with long-standing ties to the United States may be deported without any right to seek judicial relief or intervention—even if the deportation order is based on an erroneous interpretation of the law.

Yesil's petition is far from frivolous. Indeed, the Government's arguments are rejected and the petition is granted, as set forth below.

## STATEMENT OF THE CASE

### A. *Statutory Background*

#### 1. *Section 212(c)*

Under the INA, aliens convicted of certain criminal offenses, including "aggravated felon[ies]" and certain drug offenses, are "deportable" and "shall, upon the order of the Attorney General, be deported." INA § 241(a)(2), 8 U.S.C. § 1251(a)(2). Section 212(c) of the INA gives the Attorney General the discretion to waive deportation for lawful permanent residents who have had "lawful unrelinquished domicile" in the United States for "seven consecutive years."[1] 8 U.S.C.

---

1. Section 212(c) provides:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General....

8 U.S.C. § 1182(c). Although section 212(c) by its terms applies to residents returning from temporary departures abroad, it has long been interpreted to apply to lawful permanent residents who have not left the United States but who face deportation. *See, e.g., Hussein v. INS,* 61 F.3d 377, 379 & n. 3 (5th Cir.1995) (citing cases); *Castellon–Contreras v. INS,* 45 F.3d 149, 151 & n. 2 (7th Cir.1995) (citing cases). This interpreta-

§ 1182(c). Section 212(c), which has been described by the Second Circuit as a "humane provision," was enacted by Congress "to provide the Attorney General the flexibility and discretion to permit worthy aliens to continue their relationships with family members in the United States despite a ground for exclusion." *Lok v. INS*, 548 F.2d 37, 39 (2d Cir.1977) (*"Lok I"*).

### 2. *The AEDPA*

On April 24, 1996, the first anniversary of the Oklahoma City bombing, President Clinton signed into law the AEDPA. Title IV of the AEDPA amends certain provisions of the INA that govern deportation of "alien terrorists" and other aliens convicted of certain criminal offenses.

Section 106 of the INA is entitled "Judicial review of orders of deportation and exclusion, and special exclusion." 8 U.S.C. § 1105a. Subsection (a) provides that

> [t]he procedure prescribed by, and all the provisions of chapter 158 of Title 28 shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States [convicted of aggravated felonies], except that....

8 U.S.C. § 1105a(a). Subsection (a) then lists ten sub-subsections, 8 U.S.C. § 1105a(a)(1) to (10), that constitute exceptions to the proviso that the procedures of chapter 158 of Title 28 of the United States Code govern. Chapter 158 sets forth the procedure for obtaining judicial review of final orders of federal agencies, namely, the filing of a petition to review in the appropriate court of appeals. 28 U.S.C. §§ 2342, 2344.

Prior to enactment of the AEDPA, sub-subsection (10) of section 106(a) provided as follows:

> (10) *Habeas corpus*

> tion is based on the Second Circuit's holding in *Francis v. INS* that the Equal Protection Clause forbids distinguishing in this context between aliens who departed abroad temporarily and face deportation and those who never left and face deportation. 532 F.2d 268, 272–73 (2d Cir. 1976).

> any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings.

Section 401(e) of the AEDPA struck that language and section 440(a) provided for a new section 106(a)(10):

> (10) Any final order of deportation against an alien who is deportable by reason of having committed [certain crimes, including aggravated felonies and controlled substance offenses] shall not be subject to review by any court.

8 U.S.C. § 1105a(a)(10). Hence, the provision permitting judicial review of deportation orders by a petition for writ of habeas corpus was eliminated and replaced by a provision barring review "by any court" of final deportation orders issued against aliens convicted of certain crimes.

### 3. *Section 2241*

Section 2241 of Title 28 of the United States Code provides in part as follows:

> (a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions....

> (c) The writ of habeas corpus shall not extend to a prisoner unless ... [h]e is in custody in violation of the Constitution or laws or treaties of the United States....

28 U.S.C. § 2241(a), (c)(3). The AEDPA did not expressly purport to modify section 2241.

### B. *The Facts*

Yesil is a 35–year old native of Turkey who resides in New York City, within the Southern District of New York. (Pet. Mem. at 3; *see* R. 234, 262, 268).[2] He entered the United States on a student visa in 1979, when he was 16 years old. (R. 286, 289). On August 21, 1987, he married a United States citizen (R. 105), and on November 17, 1987, he applied for status as a lawful permanent resi-

2. "Pet. Mem." refers to Yesil's memorandum of law dated December 30, 1996. References to "R." are page references to the certified administrative record of Yesil's deportation proceedings.

dent on the basis of that marriage. (R. 108–10). His application was granted on March 25, 1988. (R. 114).

Unfortunately, however, Yesil became involved in the illegal distribution of drugs in or about April 1987. (Return, Exh. 2). He was indicted in the United States District Court for the Middle District of Florida in March 1990 for conspiracy to distribute cocaine. (R. 241–49). Following a plea of guilty, Yesil was convicted in November 1990 of aiding and abetting the distribution of one kilogram of cocaine. (R. 240, 250; see Return, Exh. 2). He was sentenced to a six-year term of imprisonment, a three-year term of special parole, and fined $150,000. (Id.).

Yesil began cooperating with law enforcement authorities after he was indicted. (R. 116, 124). The Broward County Sheriff's Office, the State Attorney's Office for the 17th Judicial Circuit of Florida, the Fort Lauderdale Police Department, the Federal Bureau of Investigation, and the United States Attorney for the Middle District of Florida have acknowledged his cooperation and "valuable assistance." (R. 115–31). His efforts, which included working undercover and making "headway in infiltrating" a cocaine and heroin organization, helped lead to "many arrests and multi-kilogram drug confiscations." (R. 116, 118, 124–25; see also R. 131). The United States Attorney for the Middle District of Florida personally wrote a letter attesting to Yesil's "significant cooperation." (R. 130–31). Moreover, "the bulk of [Yesil's] cooperation occurred subsequent to [his] sentence and [was] unrewarded cooperation." (R. 133).[3]

In July 1986, Yesil founded a contact lens and eyewear company in Florida called Lens Express. (R. 95, 135, 137; compare R. 140 (listing Lens Express as an employer), 283 (same)). It eventually became a "very successful venture" that employed some 250 people. (R. 135). Yesil recently sold the company and started a new business, which employs 25 American workers and uses the services of some 1,600 sales representatives. (Pet. Mem. at 5).[4]

## C. The Initial Deportation Proceedings

As Yesil was completing his term of imprisonment at the Federal Correctional Institution in Oakdale, Louisiana, INS commenced deportation proceedings against him based on his 1990 drug conviction. Consequently, he was continued in custody for some four or five months in connection with the deportation proceedings. On January 5, 1994, INS served an order to show cause and notice of hearing on him at Oakdale. (R. 359–65). The order to show cause, which charged Yesil with being deportable pursuant to section 241(a)(2)(A)(iii) of the INA, 8 U.S.C. § 1251(a)(2)(A)(iii), on the basis of his conviction for an "aggravated felony," was filed with the Office of the Immigration Judge of the Executive Office for Immigration Review in Oakdale on January 21, 1994. (R. 358–65).

The IJ held several hearings, both in person and by telephone. (R. 208–39). Yesil moved to change venue of the deportation proceedings from Louisiana to New York, but the motion was denied because the IJ wanted to resolve the issue of deportability first. (R. 218–23, 237, 341 ("The court will consider a Change of Venue after Deportation has been resolved and only if the alien is eligible for relief from Deportation.")). On

3. By letter to petitioner's counsel dated February 13, 1997, the U.S. Attorney's Office for the Middle District of Florida wrote as follows:

Most of Mr. Yesil's cooperation was unrewarded by the district court here in Orlando. The judge allowed Mr. Yesil to extend his reporting date to prison to provide additional assistance to the FBI in a narcotics investigation, but later refused to consider the government's Rule 35 motion to reduce defendant's sentence. After two successful appeals, Mr. Yesil ultimately got a hearing on the Rule 35 motion, but by then [he] had already been released from prison. Thus, Mr. Yesil rendered cooperation to the government that was never rewarded.

(Letter dated Feb. 13, 1997 from Assistant U.S. Attorney Cynthia Hawkins Collazo to Michael P. DiRaimondo).

4. The Government quarrels with some of Yesil's factual assertions, the vast majority of which are supported by documentary evidence. Since Yesil never had an evidentiary hearing below on his section 212(c) application, I will accept his factual assertions as true for purposes of this petition.

April 12, 1994, Yesil was released from custody on a $20,000 bond. (R. 351, 353). He returned to New York City, where he and family members resided and where he was serving his term of special parole under the supervision of the United States Probation Office. (R. 337–38, 348).

On August 31, 1994, the IJ issued a written decision denying petitioner's motion to change venue and ordering him deported from the United States. (R. 204–07). He held that an alien was required to be a lawful permanent resident for seven years before being eligible for a waiver pursuant to section 212(c). (R. 206). Although he noted the existence of Second Circuit law to the contrary, the IJ concluded that he was not bound by Second Circuit law. (*Id.*). The IJ wrote:

> In cases arising outside of the second circuit, i.e., the instant case, it is well-settled that in order to be eligible to receive a § 212(c) waiver, an alien must have been an LPR for at least seven years and any time spent in the U.S. in an immigration status besides that of a permanent resident, cannot be applied towards the seven year requirement.... Under the authority of the BIA (which is controlling in the present case), the time that [Yesil] spent in the U.S. in student status cannot be tacked onto the time which he has been an LPR to meet the seven year domicile requirement. Since [Yesil] has not been an LPR for at least seven year[s], he is statutorily ineligible to apply for a waiver of inadmissibility under § 212(c) of the [INA]....

(R. 206 (citations omitted)). The IJ also denied the request for a change of venue again, on the basis that Yesil was ineligible to apply for a section 212(c) waiver. (R. 207).

On September 9, 1994, Yesil appealed to the BIA. (R. 199–201). In addition, on November 23, 1994, seven years and six days after he had applied for lawful permanent resident status, Yesil filed a formal application for a section 212(c) waiver. (R. 140–44). At approximately the same time, he filed a "Motion to Reopen" the deportation proceedings. (R. 178–86).

On March 17, 1995, in a written decision, the BIA dismissed Yesil's appeal and denied his motion to reopen the proceedings. (R. 145–52). The BIA held that time prior to the granting of lawful permanent resident status could not be counted toward an alien's years of "lawful unrelinquished domicile." (R. 149), noting:

> The [BIA] has consistently held that the acquisition of lawful domicile time for purposes of eligibility under section 212(c) of the [INA] must be subsequent to the date of admission as a lawful permanent resident.

(R. 149). Specifically, the BIA held that Yesil could not include the period from the date he applied for lawful permanent resident status through the time his application was granted, on the theory that Yesil's status under his student visa was no longer "lawful" because his intent to remain permanently was inconsistent with his status. (R. 150–51). The BIA also concluded that the IJ had properly denied the venue motion, accepting the IJ's reasoning that because Yesil was ineligible to be considered for section 212(c) relief, "there was no need to change venue." (R. 152).

After the BIA's March 17, 1995 decision, INS issued a notice directing Yesil to surrender at the Oakdale facility. The notice was sent to Yesil in New York. (Pet. Mem. at 7; Pet. ¶ 12).

### D. Subsequent Judicial and Administrative Proceedings

On April 14, 1995, Yesil filed a petition to review the BIA's March 17, 1995 decision with the Second Circuit. On May 2, 1995, the Second Circuit granted Yesil a stay of deportation pending disposition of his petition to review. (Pet. ¶ 11). INS, however, refused to vacate the surrender notice. Consequently, Yesil filed a petition for a writ of habeas corpus in the Eastern District of New York seeking to stay INS's directive that he surrender in Louisiana. Eventually, Yesil's New York counsel negotiated an agreement with INS officials in Oakdale pursuant to which the surrender notice was vacated, Yesil was permitted to remain at large, and his bond was increased from $20,000 to $75,000,

fully collateralized. (Pet. ¶ 12 & Exh. A) As a result of this agreement, Yesil and the Government stipulated to dismissal of the Eastern District action. (Pet. ¶ 13 & Exh. B).

In July 1995, Yesil and the Government entered into a stipulation in the Court of Appeals pursuant to which Yesil's petition to review was withdrawn, subject to reinstatement within 30 days after a decision on a motion to be filed by Yesil with the BIA to reopen the deportation proceedings and for reconsideration of its March 17, 1995 decision. (R. 17; Pet. ¶ 14). The stipulation provided that the Second Circuit's stay of deportation would remain in effect. (R. 17).

In August 1995, Yesil filed a motion to reopen with the BIA. (R. 14–144). On July 3, 1996, almost a year later and some two months after enactment of the AEDPA, the BIA denied the motion, concluding that Yesil was not eligible to be considered for section 212(c) relief under either Second Circuit or Fifth Circuit law. (R. 1–10). One Board member (Lory D. Rosenberg) dissented, expressing the view that Yesil was eligible to be considered for section 212(c) relief. (R. 5–10).

On July 23, 1996, Yesil reinstated his petition to review the BIA's March 17, 1995 decision. On August 1, 1996, he filed a new petition to review the BIA's July 3, 1996 decision. (Pet. ¶ 15). The Government moved to dismiss both petitions for lack of subject matter jurisdiction. (Pet. ¶ 16 & Exh. C). In his opposition to the motion, Yesil argued that if the Court of Appeals did not believe it had subject matter jurisdiction (because of the AEDPA) to hear the petitions to review, his petitions should be treated as petitions to the Court for a writ of habeas corpus. (Return, Exh. 4, at 11–12).

On October 29, 1996, the Second Circuit granted the Government's motion to dismiss the petitions for lack of subject matter jurisdiction, holding that "[t]his case is not sufficiently distinguishable from Hincapie–Nieto v. INS, 92 F.3d 27 (2d Cir.1996)." (Pet., Exh. C).

In the meantime, on October 10, 1996, INS in Louisiana mailed to Yesil in New York a notice to surrender at Oakdale, Louisiana on October 28, 1996 at 9 a.m. (Return, Exh. 5; Pet. ¶ 17). After Yesil's counsel was unable to persuade INS to withdraw the surrender notice, Yesil commenced a new action on October 25, 1996 in the Eastern District of New York seeking a stay of surrender. (Pet. ¶ 18). That same day, Yesil commenced proceedings in the Southern District of New York, seeking a stay of the surrender date. On October 28, 1996, Judge Cedarbaum issued a stay of surrender pending an application by Yesil to the Second Circuit for a stay and a decision on that application. (Pet., Exh. D). Yesil filed such an application, which the Second Circuit denied shortly before 5 p.m. on October 28, 1996. (Pet., Exh. E). At that point, it was impossible for Yesil to comply with the surrender notice, which had called for his surrender in Louisiana on October 28th at 9 a.m.

### E. *The Present Petition*

Yesil did not surrender or contact INS about a new surrender date. Instead, on November 8, 1996, he filed the present petition for a writ of habeas corpus and sought a stay of surrender by order to show cause. A hearing was held on November 19, 1996, at the conclusion of which I stayed Yesil's surrender pending further proceedings in this case. (11/19/96 Tr. at 26–27).

The Government opposes the petition on both procedural and substantive grounds. First, it contends that the only proper respondent is the District Director of INS in New Orleans, Louisiana, over whom the Court purportedly does not have personal jurisdiction. Second, the Government contends that the petition should be dismissed under the abuse of writ doctrine because Yesil has filed three prior petitions for habeas corpus relief. Third, the Government argues that the Court lacks subject matter jurisdiction to hear the petition because the AEDPA eliminated judicial review of deportation orders, except to the extent that constitutional claims may be raised, and then only directly to a court of appeals. Fourth, as to the merits, the Government argues that petitioner's challenge to the BIA's finding of deportability is frivolous.

A final issue that merits discussion is Yesil's claim that the denial of his motion for change of venue by the IJ and the BIA violated his constitutional rights.

## DISCUSSION

### A. Personal Jurisdiction

■ As the Second Circuit has held, "for a court to entertain a habeas corpus action, it must have jurisdiction over the petitioner's custodian." *Billiteri v. United States Bd. of Parole,* 541 F.2d 938, 948 (2d Cir.1976); *see also Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 494–95, 93 S.Ct. 1123, 1129–30, 35 L.Ed.2d 443 (1973). In the present case, the Government argues that Yesil's custodian, and hence the appropriate respondent, is the District Director of INS in the New Orleans District (the "New Orleans District Director"), whose jurisdiction includes Oakdale, Louisiana. The Government further contends that this Court lacks personal jurisdiction over the New Orleans District Director, and that consequently the relief requested by Yesil cannot be granted in these proceedings.

In response, Yesil makes two arguments. First, he contends that, in the circumstances of this case, the Attorney General is his custodian and hence a proper respondent over whom the Court has personal jurisdiction. Second, he contends that this Court has jurisdiction over the New Orleans District Director in any event.

The Government's objection to personal jurisdiction is overruled, for I find that the New Orleans District Director, by his actions in this case, has purposefully thrust himself into the Southern District of New York. Accordingly, he is subject to this Court's jurisdiction for purposes of this case.[5]

INS knew, when Yesil was released on the $20,000 bond, that he was returning to New York City. That bond was later increased to $75,000 after negotiations between Yesil's counsel in New York and INS officials in Louisiana. The New Orleans District Director sent a letter to Yesil's counsel in New York confirming the increase. He later sent a surrender notice to Yesil in New York directing Yesil to surrender in Louisiana. Although that surrender was initially stayed, the Government has taken the position that once the Second Circuit denied his motion for a stay of surrender on October 28, 1996, Yesil was "obligated to surrender forthwith." (11/19/96 Tr. at 9).

On behalf of the New Orleans District Director as well as the other respondents, the Government has sought Yesil's surrender in the proceedings before me. When the issue of a stay of surrender was argued before me, the Government stated: "We demand that Mr. Yesil comply with his obligations to surrender. He is an alien under final order of deportation who's been noticed to surrender." (11/19/96 Tr. at 20). Moreover, at the Government's request, and as a condition to staying surrender, I ordered Yesil to report to INS at 26 Federal Plaza regularly in person and by telephone. (*Id.* at 26–27). Yesil has been reporting to INS in New York, as ordered, and hence he has been in the custody of INS in New York at least to that extent.

As the New Orleans District Director has engaged in purposeful activity in the Southern District of New York, through his direct efforts as well as the indirect efforts of his representatives and INS officials in New York, the Court has personal jurisdiction over him. Fed.R.Civ.P. 4(e)(1), 4(i); N.Y. C.P.L.R. 302(a)(1), (2) (McKinney 1990); *accord Eltayeb v. Ingham,* 950 F.Supp. 95 (S.D.N.Y. 1997) (in habeas action brought by alien to challenge deportation, court held that it had personal jurisdiction over INS District Director who was located in Western District of New York because the court had jurisdiction under New York law over persons within the state); *see also Nwankwo,* 828 F.Supp. at 175–76 (court had personal jurisdiction over Attorney General, based on Fed.R.Civ.P. 4 and New York law, because she transacts business in New York).

Several additional considerations support the conclusion that I should exercise personal

---

5. Consequently, I do not reach Yesil's argument that the Attorney General is an appropriate respondent. *But see Nwankwo v. Reno,* 828 F.Supp. 171, 174 (E.D.N.Y.1993) ("The Attorney General is plainly the legal custodian of the petitioner.").

jurisdiction over the New Orleans District Director. First, there is a substantial relationship between the New Orleans District Director's actions and this jurisdiction—he is seeking the surrender of a resident of the State of New York who is present in the Southern District of New York. Hence, this Court has an interest in adjudicating the issues presented. Second, the Government and the New Orleans District Director are not prejudiced in any way by being required to litigate in this Court; indeed, traditionally INS has been well represented in this District. Third, if the Government is correct in its contention that INS's designation of the place for surrender controls personal jurisdiction, INS's choice of a surrender location could significantly affect an alien's rights where, as here, the law varies from circuit to circuit. Finally, in the interest of judicial economy, this Court should hear the case. This matter has already been heavily litigated in the Second Circuit, in the Eastern District of New York, and in this Court. Both Yesil's lawyers and respondents' counsel have expended extensive efforts on this matter, and they are all located in the New York area. In these circumstances, it does not make sense to send this case to the Western District of Louisiana, where there is a "serious backlog in the processing of habeas corpus petitions." (Keene Reply. Decl. ¶ 3). *See Eltayeb,* 950 F.Supp. at 99–100 (declining to transfer habeas petition because of "the interests of judicial efficiency").

## B. *The Abuse of Writ Doctrine*

■ The Government's reliance on the abuse of writ doctrine borders on the frivolous. The Government argues that Yesil's claims should not be heard on the merits now because he failed to raise the merits in his prior three habeas petitions. But as the

Government concedes, the prior three habeas petitions were brought solely to seek a stay of surrender. Yesil did not challenge the merits of the deportation order in any of those three proceedings because there was no reason for him to do so. At the time each of those petitions was brought, Yesil already had a petition for review of the deportation order pending in the Second Circuit. Moreover, when the first of his habeas petitions was filed, the AEDPA had not even been enacted, and thus Yesil's remedy clearly was to seek review in the Second Circuit. Although the AEDPA had taken effect by the time his second and third habeas petitions were filed, the law was unsettled and, in any event, the petitions for review in the Second Circuit were still pending. Even if Yesil had asserted the merits in any of the three prior habeas petitions, the Government surely would have argued against reaching the merits on the basis of lack of subject matter jurisdiction. Therefore, the Government's argument that Yesil cannot be heard on the merits now because he should have raised the merits before is rejected.

## C. *Subject Matter Jurisdiction*

Section 440(a) of the AEDPA amended section 106(a)(10) of the INA to eliminate the language that provided for "judicial review" by "habeas corpus proceedings" of deportation orders. That language was replaced with new language to the effect that final deportation orders against aliens convicted of aggravated felonies "shall not be subject to review by any court." As a consequence, at least seven courts of appeals have held that they no longer have subject matter jurisdiction to hear petitions to review final deportation orders entered against aliens convicted of certain criminal offenses.[6]

---

6. *See, e.g., Boston–Bollers v. INS,* 106 F.3d 352, 355 (11th Cir.1997) ("we hold that section 440(a)(10) deprives this court of jurisdiction over [the] petition"); *Kolster v. INS,* 101 F.3d 785, 786 (1st Cir.1996) (dismissing petition for review for lack of jurisdiction); *Salazar–Haro v. INS,* 95 F.3d 309, 311 (3d Cir.1996) ("We hold ... that the amendment to [INA § 106(a)(10)] ... withdraws our jurisdiction to review the petition on the merits."); *Hincapie–Nieto v. INS,* 92 F.3d 27, 28 (2d Cir.1996) ("We conclude that the AEDPA has repealed the jurisdiction a court of appeals

formerly had over petitions for review filed by aliens convicted of [certain] drug offenses.... "); *Qasguargis v. INS,* 91 F.3d 788, 789–90 (6th Cir.1996) (petition for review dismissed), *cert. denied,* —— U.S. ——, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997); *Duldulao v. INS,* 90 F.3d 396, 400 (9th Cir.1996) ("Since aliens have no constitutional right to judicial review of deportation orders, section 440(a) does not offend due process."); *Mendez–Rosas v. INS,* 87 F.3d 672, 673 (5th Cir.1996) (dismissing petition for review for lack of jurisdiction), *cert. de-*

The question remains, however, as to whether and, if so, to what extent habeas corpus review remains available to aliens who are now precluded by section 440(a) from seeking judicial review. Several of the circuit courts, in acknowledging that their jurisdiction has been withdrawn by the AEDPA, emphasized that some means of seeking judicial relief remained available, without delineating the nature or scope of such relief.[7]

Yesil and the Government disagree on the nature and scope of the judicial review that remains. Yesil contends that section 440(a) does not eliminate the general grant of habeas jurisdiction bestowed upon the district courts by section 2241. The Government concedes that some review remains available, but contends that judicial review is permitted only with respect to "substantial constitutional claims" and then only by way of petition for review to the courts of appeals. (Govt. Mem. at 23–41). The Government contends that Yesil's petition does not present a substantial constitutional claim and that his claims do not involve "any fundamental defect that inherently results in a miscarriage of justice." (Govt. Mem. at 42).

Three issues are presented by the parties' arguments: First, did the AEDPA repeal section 2241? Second, is judicial review of deportation orders limited to "substantial constitutional claims" or may non-constitutional errors be reviewed as well? And third, may judicial review of final orders of deportation only be sought in the courts of appeals?

### 1. *The AEDPA and Section 2241*

■ I hold that the AEDPA did not repeal section 2241 and that therefore the district courts have habeas corpus jurisdiction pursuant to section 2241 to review final orders of deportation with respect to aliens "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. I reach this conclusion for at least four reasons.

First, although no circuit court has apparently yet ruled on the issue, at least five district courts, including Judge Sand in this Court, have held that they continue to have habeas jurisdiction under section 2241 to review deportation orders.[8] The Government has not brought to my attention any decision holding that section 2241 has been repealed by the AEDPA.

Second, two Supreme Court decisions strongly support the conclusion that section 440(a) of the AEDPA has not repealed section 2241. *Felker v. Turpin*, —— U.S. ——, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996); *Ex Parte Yerger*, 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1868). Both involved the situation where Congress had passed laws that limited the jurisdiction of the Supreme Court and

---

*nied*, —— U.S. ——, 117 S.Ct. 694, 136 L.Ed.2d 617 (1997).

7. See *Kolster v. INS*, 101 F.3d 785, 790–91 (1st Cir.1996) ("the INS has agreed that ... any habeas review that is required by the Constitution remains available"; "the INS acknowledges that some avenue for judicial review remains available to address core constitutional and jurisdictional concerns"); *Salazar–Haro v. INS*, 95 F.3d 309, 311 (3d Cir.1996) ("we do not foreclose judicial review of all claims by aliens arising in the course of deportation proceedings"); *Hincapie–Nieto v. INS*, 92 F.3d 27, 30–31 (2d Cir.1996) ("the Government acknowledges that at least some avenue of judicial relief remains available"; "[w]e express no opinion on the nature of the remedy or the scope of review that remains available in any court").

8. *Veliz v. Caplinger*, No. Civ. A. 96–1508, 1997 WL 61456, at *2 (E.D.La. Feb.12, 1997) (" 'The privilege of habeas corpus is assured by constitutional mandate and by generalized statutory directions.' ") (quoting Gordon and Mailman, *Immigration Law & Procedure*, § 21.04[5] (Desk ed.1996), and citing U.S. Const., Art. 1, Sec. 9, and 28 U.S.C. § 2241); *Eltayeb v. Ingham*, 950 F.Supp. 95, 99–100 (S.D.N.Y.1997) (Sand, J.) ("This Court concludes, as have other district courts, that habeas review continues to be available under § 2241."); *Powell v. Jennifer*, 937 F.Supp. 1245, 1252–53 (E.D.Mich.1996) (holding that habeas review continues to be available under section 2241 where the alien's deportation would result in a "fundamental miscarriage of justice"); *Dunkley v. Perryman*, No. 96 C 3570, 1996 WL 464191, at *2–3 (N.D.Ill. Aug.9, 1996) (" § 440(a) of the AEDPA does not clearly eliminate the court's jurisdiction" over the alien's habeas petition, nor did it place the petition "within the exclusive jurisdiction of the federal courts of appeal"); *Mbiya v. INS*, 930 F.Supp. 609, 612 (N.D.Ga.1996) (holding that district court continued to have jurisdiction under section 2241 where the alien's deportation would result in a "fundamental miscarriage of justice").

that arguably repealed its habeas corpus jurisdiction by implication.

The federal courts have had the power to grant writs of habeas corpus since enactment of the Judiciary Act of 1789.[9] Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82 (the "1789 Act"). *See Felker,* —— U.S. at ——, 116 S.Ct. at 2338. In 1867, Congress expanded the Supreme Court's statutory appellate jurisdiction while also expanding the power of the federal courts to issue writs of habeas corpus, permitting the issuance of such writs "in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." Act of Feb. 5, 1867, ch. 28, 14 Stat. 385 (the "1867 Act").[10] In 1868, Congress revoked the appellate jurisdiction it had given with the 1867 Act. Act of Mar. 27, 1868, ch. 34, § 2, 15 Stat. 44 (the "1868 Act"). In *Yerger,* the Court considered whether the 1868 Act also deprived the Court of the power to hear an appeal from a lower court's decision on a habeas petition or to entertain a habeas petition under the 1789 Act. The Court held that it did not because the 1868 Act made no reference to habeas jurisdiction under the 1789 and 1867 Acts. The Court rejected the argument that the 1868 Act had repealed its habeas power by implication, and ruled that "[r]epeals by implication are not favored." 75 U.S. at 105; *see Felker,* —— U.S. at ——, 116 S.Ct. at 2338.

More recently, in *Felker,* the Supreme Court re-visited the issue of repeals by implication of its habeas power, specifically in the context of the AEDPA and section 2241. The Court held that Title I of the AEDPA did not repeal the Court's authority to entertain original habeas petitions filed pursuant to section 2241. —— U.S. at —— – ——, 116 S.Ct. at 2337–38. Title I was intended to limit Supreme Court review of successive habeas petitions deemed to be non-meritorious by the courts of appeals. It does not, however, make mention of section 2241, and the Court held that Title I of the AEDPA did not repeal section 2241 by implication. ——

U.S. at —— – ——, 116 S.Ct. at 2338–39 (citing *Yerger* ).

Third, the language of the amendments enacted by the AEDPA is at best ambiguous. Sections 401 and 440 of the AEDPA do not state that they repeal or amend section 2241; indeed, they do not mention section 2241 at all. *Cf. Felker,* —— U.S. at ——, 116 S.Ct. at 2338 ("[n]o provision of Title I mentions our authority to entertain original habeas petitions"). The amended section 106 of the INA is now "utterly silent on the question of habeas jurisdiction." *Powell,* 937 F.Supp. at 1252. Seeking to distinguish *Felker,* the Government argues that the plain language of the AEDPA repeals habeas jurisdiction under section 2241 not implicitly but *"expressly,"* pointing, among other things, to the heading to section 401(e): "Elimination of Custody Review by Habeas Corpus." (Govt. Mem. at 24, 29) (citing AEDPA §§ 401(e), 440(a), 110 Stat. 1268, 1276–77 (1996)). The Government is simply incorrect. The plain language does not expressly repeal section 2241. Nor does the heading to section 401(e) carry much weight, for other headings contradict the Government's argument. Section 401 is entitled "Alien Terrorist Removal" and is part of Subtitle A, "Removal of Alien Terrorists." In contrast, section 440 is entitled "Criminal Alien Removal" and is part of Subtitle D, "Criminal Alien Procedural Improvements." 110 Stat. at 1357, 1367, 1372, 1375–76. Hence, one could reasonably argue, on the basis of the headings, that section 401 has no application to Yesil at all, as no suggestion has been made that he was an "Alien Terrorist."

Finally, the Supreme Court has made it clear that Congress cannot eliminate habeas corpus review over final deportation orders unless there is some alternative avenue for review. In *Heikkila v. Barber,* 345 U.S. 229, 234, 73 S.Ct. 603, 605–06, 97 L.Ed. 972 (1953), the Supreme Court noted that under the Immigration Act of 1891, 26 Stat. 1084, as well as the Immigration Act of 1917, 39 Stat. 890, Congress intended to make admin-

---

**9.** In *Yerger,* the Court wrote: "The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defence of personal freedom." 75 U.S. at 95.

**10.** In *Felker,* the Court noted that the 1789 and 1867 Acts were the "direct ancestor[s]" of section 2241. —— U.S. at —— nn. 1, 2, 116 S.Ct. at 2338 nn. 1, 2.

istrative deportation decisions "nonreviewable to the fullest extent possible under the Constitution." *See also id.* at 234, 73 S.Ct. at 605 ("Clearer evidence that for present purposes the Immigration Act of 1917 is a statute precluding judicial review would be hard to imagine."). Yet, the Court observed, aliens had historically been able to attack deportation orders by petitions for writ of habeas corpus.. *Id.* (*See also* cases cited in Pet. Mem. at 14–16; Amicus Mem. at 15–18). Since the AEDPA has now stripped the courts of appeals of the jurisdiction to hear petitions for review, section 106 of the INA, as amended, and section 2241 must be interpreted to permit habeas review of deportation orders in the district courts.

For all these reasons, I hold that section 2241 has not been repealed by the AEDPA.

### 2. *Constitutional v. Non–Constitutional Claims*

The conclusion that section 2241 has not been repealed does not end the inquiry, for the issue remains as to whether the district courts' jurisdiction to hear habeas petitions is limited to "substantial constitutional claims." In an effort to balance Congress's evident intent in enacting sections 401(e) and 440(a) of the AEDPA to limit habeas review of deportation orders against the "grave constitutional issues" that would be raised by the conclusion that habeas relief is no longer available to deportable aliens, the district courts that have addressed the issue have held that review must be limited situations where there is a threat of "a fundamental miscarriage of justice." *Eltayeb v. Ingham,* 950 F.Supp. at 98, 100; *accord Powell,* 937 F.Supp. at 1252–53; *Mbiya,* 930 F.Supp. at 612. On the other hand, section 2241, by its terms, is not limited to constitutional claims; rather, it provides for habeas review where a prisoner is "in custody in violation of the Constitution *or laws or treaties of the United States.*" 28 U.S.C. § 2241(c)(3) (emphasis added).

I need not decide this issue, however, for in the present case there is the threat of a fundamental miscarriage of justice and Yesil has presented substantial constitutional claims.

The Government argues that no constitutional claim is implicated because an alien has no substantive due process right not to be deported (Govt. Mem. at 33) (citing *Linnas v. INS,* 790 F.2d 1024, 1031 (2d Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986)) and because " 'no judicial review [of deportation orders] is guaranteed by the Constitution.' " (Govt. Mem. at 33) (quoting *Carlson v. Landon,* 342 U.S. 524, 537, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952)). It is true that the federal government is entitled to great deference in the area of immigration. *See Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993) ("over no conceivable subject is the legislative power of Congress more complete") (citations omitted). Yet, it is equally true that aliens within this country who face expulsion are entitled to the *procedural* safeguards of due process. As the Supreme Court has held,

> once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly. Our cases have frequently suggested that a continuously present alien is entitled to a fair hearing when threatened with deportation, and, although we have only rarely held that the procedures provided by the executive were inadequate, we developed the rule that a continuously present permanent resident alien has a right to due process in such a situation.

*Landon v. Plasencia,* 459 U.S. 21, 32–33, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) (citations omitted); *accord Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954) ("In the enforcement of these policies [pertaining to the entry of aliens and their right to remain], the Executive Branch of the Government must respect the procedural safeguards of due process."); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953) (resident aliens enjoy constitutional protection); *Carlson v. Landon,* 342 U.S. 524, 537, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952) (Congress's power over immigration is "subject to judicial intervention under the 'paramount law of the Constitution' ") (quoting *Fong Yue Ting v. United*

*States,* 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893)).

■ For an alien who has chosen to make this country his home, there are few things more important than his ability to remain or more devastating than banishment by deportation. Deportation involves "issues basic to human liberty and happiness." *Wong Yang Sung v. McGrath,* 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616, *modified,* 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950). Deportation of a permanent resident is "the equivalent of banishment or exile," *Delgadillo v. Carmichael,* 332 U.S. 388, 391, 68 S.Ct. 10, 12, 92 L.Ed. 17 (1947), and when an alien is ordered deported, "the liberty of an individual is at stake." *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945). In view of the importance of these rights and the harshness of the potential consequences, any error in the interpretation of the deportation statutes is magnified.

Yesil contends that the BIA and the IJ erred in their interpretation of section 212(c). As a consequence of that alleged error, Yesil was deprived of the opportunity to be heard with respect to whether he should be granted relief from what is the equivalent of banishment or exile. Yet, the Government contends that even if the BIA and the IJ were wrong in their interpretation of the law, Yesil has no due process right to judicial review—that he can be deprived of his "human liberty and happiness" without any judicial recourse. This contention is untenable and I reject it. If Yesil is being deprived of the right to be considered for relief from deportation because of an error of law, due process requires that the error be corrected.

### 3. *The Appropriate Forum for Review*

The Government also contends that to the extent Yesil may seek judicial relief, he may do so only by presenting a petition for review to the Second Circuit. (Govt. Mem. at 37–41). The Government writes: "Section 440(a) of the AEDPA must be read as permitting judicial review of substantial constitutional claims under section 106(a) of the INA, but then only in the courts that hear

appeals from final deportation orders: the courts of appeals...." (*Id.* at 38).

At the very least, the Government's argument is inconsistent with other positions it has taken in the case. Section 106(a)(10), as amended, now provides that final deportation orders against aliens convicted of aggravated felonies "shall not be subject to review by any court." Section 106(a)(10), as amended, has been interpreted by seven circuit courts as requiring them to dismiss petitions for review of deportation orders for lack of jurisdiction. It is difficult to understand, then, how section 106(a) could be a basis for arguing, as the Government now does, that constitutional claims must be presented to the courts of appeal by petition for review. In any event, since I have now held that section 2241 has not been repealed, I may hear this case pursuant to section 2241(a).

In sum, the Court has subject matter jurisdiction to consider Yesil's petition for habeas relief from the BIA's final order of deportation. I will reach the merits.

### D. *The Merits*

The critical issue on the merits is whether Yesil had a "lawful unrelinquished domicile" in the United States of at least seven consecutive years. If so, Yesil was eligible to be considered for a waiver of deportation under section 212(c) of the INA. 8 U.S.C. § 1182(c). If not, as the IJ and BIA concluded in the administrative proceedings below, he could not have been considered for the discretionary relief.

Yesil advances two arguments to support his contention that he accumulated seven years of "lawful unrelinquished domicile." First, he contends that the period from the time he applied for lawful permanent status (November 17, 1987) until he was granted that status (March 25, 1988) should be included. If that period of four months and eight days is included, he would have been a lawfully unrelinquished domicile for seven years, counting from the date of his initial application until the date of the BIA's final order of deportation (March 17, 1995). Second, he argues that, even if only his time as a lawful permanent resident is included, under *Vargas v. INS,* 938 F.2d 358 (2d Cir.1991), he

continued to accrue time as a lawful permanent resident even after the BIA issued its final decision. If he is correct, even if one does not begin counting his time until March 25, 1988, when his application for lawful permanent resident status was granted, he would have accrued seven years as a lawful permanent resident on March 25, 1995—just eight days after the BIA's final decision.

I will address both of Yesil's arguments.

### 1. *The Period from November 17, 1987 to March 25, 1988*

■ The BIA and the IJ essentially equated "lawful unrelinquished domicile" with "lawful permanent residence status," as they concluded that only Yesil's time as a lawful permanent resident could count toward his time as a "lawful unrelinquished domicile." While the BIA has long held that "the acquisition of lawful domicile time must be subsequent to the date of admission as a lawful permanent resident" (R. 149) (citing BIA decisions), this is an issue that has split the circuits.

At least two circuits have squarely rejected the BIA's interpretation. In *Lok I*, the Second Circuit held that the BIA's "equation of the terms 'lawfully admitted for permanent residence' and 'lawful unrelinquished domicile'" for purposes of section 212(c) was "untenable." 548 F.2d at 40; *see also Rosario v. INS*, 962 F.2d 220, 222–23 (2d Cir.1992). In *Castellon–Contreras v. INS*, in the context of the Immigration Reform and Control Act of 1986 ("IRCA"), the Seventh Circuit held that "[g]iven that lawful domicile has a meaning distinct from LPR, we find no reason to equate the two terms." 45 F.3d 149, 153 (7th Cir.1995).

Although the Eleventh Circuit has not yet decided the issue, it has observed that "[t]he INS interpretation … appears to be inconsistent with the language of section 212(c), the policy underlying the section, and a holding of the Supreme Court." *Melian v. INS*, 987 F.2d 1521, 1525 n. 6 (11th Cir.1993) (citing *Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978)). The Third, Fifth and District of Columbia Circuits have "neither rejected nor upheld the BIA's interpretation." *Hussein v. INS*, 61

F.3d 377, 380 (5th Cir.1995); *accord Graham v. INS*, 998 F.2d 194, 195–96 (3d Cir.1993) (same); *Anwo v. INS*, 607 F.2d 435, 437 (D.C.Cir.1979) (same); *see also Kolster v. INS*, 101 F.3d 785, 787 (1st Cir.1996) (noting split in circuits).

The Ninth Circuit has, in essence, ruled both ways. In an IRCA case, the Ninth Circuit recently rejected INS's contention that the period of "lawful unrelinquished domicile" for purposes of section 212(c) begins accruing only after an alien gains lawful permanent residence status. *Ortega de Robles v. INS*, 58 F.3d 1355, 1358–59 (9th Cir. 1995). On the other hand, in *Castillo–Felix v. INS*, 601 F.2d 459, 467 (9th Cir.1979), the Ninth Circuit held that "aliens must accumulate seven years of lawful unrelinquished domicile after their admission for permanent residence." The *Ortega de Robles* Court distinguished *Castillo–Felix* by holding that it did not apply to aliens obtaining legal status under IRCA. 58 F.3d at 1358–59.

The only circuit other than the Ninth Circuit to have accepted the BIA's interpretation is the Fourth Circuit. In *Chiravacharadhikul v. INS*, 645 F.2d 248, 250–51 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981), a 2–to–1 decision that relied heavily on the Ninth Circuit's decision in *Castillo–Felix*, the Court deferred to the BIA's construction.

The BIA's view that only time as a lawful permanent resident can count toward the required period of "lawful unrelinquished domicile" must be rejected, for at least four reasons.

First, the plain language of section 212(c) belies the BIA's interpretation. The statute uses the words "lawful unrelinquished domicile," not the words "lawful permanent residence." As the Second Circuit observed in *Lok I*, if Congress had wanted to limit section 212(c) relief to individuals with seven years of lawful permanent residence, it could have done so explicitly by using that language. 548 F.2d at 41; *accord Castellon–Contreras*, 45 F.3d at 153. Instead, it chose other language.

Second, the terms "lawful unrelinquished domicile" and "lawful permanent residence"

have different meanings. *See Rosario,* 962 F.2d at 224 ("The terms resident and domicile, though sometimes synonymous, have different common law meanings."). It is possible for an alien to have a lawful domicile in this country without being "lawfully admitted for permanent residence." *Lok I,* 548 F.2d at 40; *accord Elkins v. Moreno,* 435 U.S. 647, 666, 98 S.Ct. 1338, 1349–50, 55 L.Ed.2d 614 (1978) (some non-immigrants may establish lawful domicile without lawful permanent resident status); *Castellon–Contreras,* 45 F.3d at 153–54. The Second Circuit in *Lok I* specifically cited as an example a student who, after residing in the United States for several years, married an American citizen and obtained an appropriate visa for admission to permanent residence. *Id.* at 40. This is precisely Yesil's situation. He entered the United States on a student visa, resided here for a number of years, married an American citizen, and applied for and was granted an adjustment in status to lawful permanent resident. When he applied, on November 17, 1987, for status as a lawful permanent resident on the basis of his marriage, he had both elements required for "lawful domicile": (1) he was present lawfully (2) with the intent to remain. *Castellon–Contreras,* 45 F.3d at 153; *Melian v. INS,* 987 F.2d 1521, 1524 (11th Cir.1993); *Lok v. INS,* 681 F.2d 107, 109–10 (2d Cir.1982).

Third, the legislative history supports the conclusion that an alien can accrue time toward section 212(c) eligibility without being a lawful permanent resident. The Senate Report states: "The subcommittee recommends that the proviso should be limited to aliens who have the status of lawful permanent residence who are returning to a lawful domicile of 7 consecutive years after a temporary absence abroad." Sen Rep. No. 1515, 81st Cong., 2d Sess. 384 (1950) (quoted in *Lok I,* 548 F.2d at 40). That language certainly suggests that the two concepts are different. Moreover, in *Lok I,* the Second Circuit noted that Congress had considered, but apparently rejected, a proposal that would have limited the discretionary waiver in the manner suggested by INS. 548 F.2d at 41. In addition, section 212(c) should be construed to effectuate its "obvious purpose ... to mitigate the hardship that deportation poses for those with family ties in this country." *Lok I,* 548 F.2d at 41. *See also Castellon–Contreras,* 45 F.3d at 153 ("Section 212(c) was designed to help 'aliens who are likely to have established strong ties to this country,' ... something not requiring LPR status.") (citations omitted).

Finally, the Second Circuit has long recognized that any ambiguities in the deportation statutes should be construed in favor of the alien. *Lennon v. INS,* 527 F.2d 187, 193 (2d Cir.1975) ("It is settled doctrine that deportation statutes must be construed in favor of the alien."). Because "[d]eportation is a sanction which in severity surpasses all but the most Draconian criminal penalties," *Lok I,* 548 F.2d at 39, and because the "interests at stake" for a permanent resident alien are "high and momentous," *Rosenberg v. Fleuti,* 374 U.S. 449, 458, 83 S.Ct. 1804, 1810, 10 L.Ed.2d 1000 (1963) (quoting *Di Pasquale v. Karnuth,* 158 F.2d 878, 879 (2d Cir.1947)), any doubt as to the correct interpretation of section 212(c) should be resolved in favor of the alien. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) (recognizing "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"); *INS v. Errico,* 385 U.S. 214, 225, 87 S.Ct. 473, 480, 17 L.Ed.2d 318 (1966) ("Even if there were some doubt as to the correct construction of the statute [INA § 241(f) ], the doubt should be resolved in favor of the alien."); *Rosario v. INS,* 962 F.2d 220, 225 (2d Cir.1992) ("in light of the harshness of deportation, ambiguous deportation provisions should be construed in favor of the alien"). A rule of lenity is particularly appropriate when the issue is *eligibility,* that is, not whether Yesil will be granted the waiver, but simply whether he will be able to apply for it. *Rosario,* 962 F.2d at 223 ("Congress' policy, at least as regards waiver *eligibility,* is tolerant rather than strict, and accordingly does not envision barriers in addition to those already found in § 212(c)").

The Government argues that Yesil could not have had the lawful intent to remain in the United States permanently while

he was here on a student visa. (Govt. Mem. at 44–45). Because a non-immigrant student in the United States "has no intention of abandoning" his foreign residence as a matter of law, the Government argues, Yesil was not lawfully domiciled in this country prior to receiving his legal permanent resident status. (*Id.*) (citing 8 U.S.C. § 1101(a)(15)(F)(i)). I disagree.

In essence, the Government is arguing that the moment Yesil applied for an adjustment of his status on November 19, 1987, his presence became unlawful. That simply was not the case. First, INS surely did not believe his status had become unlawful when he applied for a change in status. A few days later, INS granted him authorization to work and eventually, of course, the requested adjustment in status was approved. INS would not have granted either the work authorization or the adjustment in status if Yesil's presence had become unlawful. Upon receipt of the application, INS wrote him as follows:

> Your application for status as a permanent resident has been retained for processing. You will be notified when further action has been taken in your case. Your request to accept employment has been adjudicated and the result is shown below [APPROVED]. This employment application is valid only for the time necessary to decide your application for permanent residence.

(R. 112). This language unambiguously shows that INS believed that Yesil's continued presence in the United States was lawful, at least until his application for permanent residence was decided.

Second, Yesil's status as a non-immigrant student effectively terminated when he applied for an adjustment in status. At that time, it became his intent to lawfully remain indefinitely in the United States. If his application had eventually been denied, he would have had to depart the United States. While his application for adjustment was pending, he was permitted by law to remain in the United States.

In *United States v. Brissett,* 720 F.Supp. 90, 91 (S.D.Tex.1989), a criminal case, the defendant was an alien who had remained in the United States after his visitor's visa had expired but who had applied for permanent resident status. He was charged with possession of a weapon at a time when he was an alien illegally in the United States. The court dismissed the indictment, holding that "[a]n alien applicant for adjustment of status to permanent resident is not 'without authorization' to remain in the United States, and thus is not illegally' or 'unlawfully' in the country." The court cited as authority 8 C.F.R. § 274a.12 (1988). Although that regulation does not explicitly state that an alien who applies for adjustment to lawful permanent resident status is lawfully in the United States during the pendency of the application, the regulation certainly implies it, as it provides that such an alien may obtain employment authorization "in increments not exceeding one year during the period the application is pending." 8 C.F.R. § 274a.12(c)(9) (1997). *See also United States v. Hernandez,* 913 F.2d 1506, 1513 (10th Cir.1990) ("Because aliens applying for legalization of their immigration status may not be deported ..., they are not unlawfully in the United States ....") (citations omitted), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991).

Yesil's continued presence did not become unlawful simply because he chose, as was his right, to apply for an adjustment in status. As Board Member Rosenberg stated in her dissent from the BIA's July 3, 1996 decision below:

> Rather, the lawful or sanctioned character of [Yesil's] domicile from on and after the filing of his application is plain in light of § 241(i) of the [INA], as well as 8 C.F.R. § 245. Consequently, I would find that by virtue of terminating his nonimmigrant status and applying for a § 245 adjustment, there was no bar to him forming a lawful domiciliary intent.

(R. 8).

In short, I hold that the BIA erred in concluding that the period between November 17, 1987, when Yesil applied for an adjustment in status, and March 25, 1988, when that adjustment was granted, did not accrue toward his seven years of "lawful unrelin-

844

quished domicile." Hence, the BIA also erred in concluding that Yesil was not eligible to be considered for section 212(c) relief.[11]

### 2. The Period after March 17, 1995

■ Yesil argues that even if one looks only at his time as a lawful permanent resident, he acquired the necessary seven years on March 25, 1995—just eight days after the BIA's final order of deportation was issued on March 17, 1995. Yesil contends that he continued to accrue time as a lawful permanent resident even after the BIA's order because he sought judicial review to contest both the finding of deportability and the finding of ineligibility for section 212(c) relief. The issue presented, then, is whether the lawful permanent resident status ends, for purposes of the seven-year requirement, when the administrative process is completed and deportation is ordered but judicial review of deportability is sought.

Again, there is a split in the circuits. Most of the circuits that have addressed the issue of eligibility for section 212(c) relief after the issuance by the BIA of a final order of deportation have rendered decisions that do not support Yesil's position. Some have held that, where the alien had not met the seven-year requirement at the time of the final order of deportation, he could not continue to accrue time towards the required seven years as he pursued judicial review.[12] Others have held, more broadly, that an alien loses his lawful permanent resident status, and hence his eligibility for section 212(c) relief, upon the entry of a final order of deportation, even where that order was entered after more than seven years of "lawful unrelinquished domicile."[13]

The only circuit to hold that the seven-year clock continues to tick after a final BIA order and pending judicial review is the Ninth Circuit. In *Wall v. INS*, 722 F.2d 1442, 1444–45 (9th Cir.1984), the Court held that an alien who challenged the BIA's finding of deportability by petition for review became statutorily eligible for section 212(c) relief when he attained seven years of lawful domicile—even though that point was not reached until after the BIA had issued its final order of deportation. *Accord Ortega de Robles v. INS*, 58 F.3d 1355, 1361 n. 7 (9th Cir.1995) ("Because Petitioner made a nonfrivolous challenge to her deportability, she has continued to accrue time since 1988 [toward the seven years] during the pendency of this appeal.") (citing *Wall*).

11. At oral argument, the Government alleged that Yesil had "lied" on his application for lawful permanent resident status, contending that he therefore did not have "lawful intent" to be in the country. (2/14/97 Tr. at 31). The difficulty I have with this argument is that it was raised for the very first time at oral argument on February 14, 1997. The IJ did not rely on this alleged fact in rendering his decision. (R. 204–07). The BIA did not rely on this alleged fact in either of its two decisions. (R. 2–4, 146–52). Nor did the Government make this assertion in its 66–page memorandum of law in opposition to the petition. Hence, I decline to consider it now and leave it to the parties to address the issue on remand.

12. *See, e.g., Onwuneme v. INS*, 67 F.3d 273, 275 (10th Cir.1995) (holding that "an alien's presence in this country is no longer 'lawful' after entry of a final order of deportation, but only where the alien … has failed to satisfy the seven year requirement"); *Jaramillo v. INS*, 1 F.3d 1149, 1155 (11th Cir.1993) ("lawful unrelinquished domicile status for § 212(c) purposes ends [for purposes of seven-year requirement] when the deportation order becomes administratively final").

13. *See, e.g., Nwolise v. INS*, 4 F.3d 306, 310 (4th Cir.1993) ("we hold that termination of an alien's lawful permanent residence status by an order of deportation, entered after the completion of the requisite seven years of lawful unrelinquished domicile, likewise terminates that alien's eligibility for section 212(c) relief"), *cert. denied*, 510 U.S. 1075, 114 S.Ct. 888, 127 L.Ed.2d 82 (1994); *Katsis v. INS*, 997 F.2d 1067 (3d Cir. 1993) (holding, in case where alien had been a lawful permanent resident for more than seven years at time BIA issued its final order of deportation, that BIA correctly held that the alien was no longer eligible for section 212(c) relief, and hence could not file a motion to reopen proceedings in that respect, because he had lost his legal permanent resident status as a result of the final deportation order), *cert. denied*, 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 93 (1994); *Rivera v. INS*, 810 F.2d 540 (5th Cir.1987) (alien's lawful permanent status terminated upon BIA's final order of deportation, rendering him ineligible for section 212(c) relief, even where he had been a lawful permanent for more than seven years at time BIA issued its order), *vacating* 791 F.2d 1202 (5th Cir.1986).

The Second Circuit has not directly addressed the question. Yesil relies heavily on *Vargas v. INS*, 938 F.2d 358 (2d Cir.1991), but that case is not controlling. *Vargas* did not involve the precise issue of whether the alien continued to accrue time as a lawful permanent resident after the BIA's final order of deportation and pending proceedings for judicial review. Rather, the alien in *Vargas* had accumulated substantially more than seven years time as a lawful permanent resident when the BIA issued its final deportation order. 938 F.2d at 358–59. The issue was whether the alien could file a motion to reopen the proceedings on the denial of section 212(c) relief to submit new evidence. *Id.* at 360. INS argued that the alien could not move to reopen the proceedings because he had lost his status as a lawful permanent resident when the BIA issued its final order of deportation. The Second Circuit rejected the argument and held that a final order of deportation did not bar an alien from requesting reopening of a properly filed section 212(c) request for relief. *Id.* at 363; *accord Goncalves v. INS*, 6 F.3d 830 (1st Cir.1993) (BIA's rule barring motions to reopen deportation proceedings to seek reconsideration of BIA's order denying section 212(c) relief was arbitrary).

At best, *Vargas* is not inconsistent with Yesil's contention that the seven-year clock continues to run after the BIA's final order of deportation. *Vargas* simply does not, however, hold that the clock in fact continues to run.

Yesil also relies on *Anderson v. McElroy*, 953 F.2d 803 (2d Cir.1992), and two unreported BIA decisions, *In re Veloso–Erbetta*, A 37 465 465 (BIA Jan. 24, 1990) (*see* R. 67–70), and *In re Pichardo*, A 40 077 409 (BIA Apr. 5, 1993) (*see* R. 83–84). Those decisions involved situations where INS or the BIA agreed to remand a case to the IJ to consider a section 212(c) application where the alien acquired the necessary seven years after the IJ's initial decision but before the BIA issued a final order of deportation. *Anderson*, 953 F.2d at 806; *Veloso–Erbetta*, slip op. at 4 (*see*

R. 70); *Pichardo*, slip op. at 2 (*see* R. at 84). These cases are therefore distinguishable from the present situation, for the required seven years were accrued in those. cases *before* the BIA issued its final order of deportation.

I am not persuaded that Yesil continued to accrue time toward the seven-year requirement after the BIA issued its final order. Although I agree that Yesil did not lose his permanent resident status after issuance of the BIA's order to the extent that (i) he could file a motion to reopen and (ii) he would be eligible for relief in the event he otherwise prevailed,[14] the BIA's view that an alien cannot continue to accrue time toward the seven years after issuance of a final order of deportation is not unreasonable. *See Jaramillo*, 1 F.3d at 1154 (finding to be "reasonable and permissible" Board's reasoning that "permitting lawful residence time to accrue pending review by the court of appeals would be unacceptable, because the appellate courts' scope of review is limited to errors of law or unfairness in procedure," and because "spurious appeals" would be encouraged). It should also be noted that in *Vargas* the Second Circuit cited as a reason for its ruling that the alien could file a motion to reopen that it did not have before it the concern that an alien was manipulating deportation proceedings "so as to acquire the seven years of domicile." 938 F.2d at 361.

In sum, Yesil's alternative argument on the merits is rejected.

### E. *Venue*

I discuss venue briefly only to make the following observations. I am reluctant to second-guess the IJ and BIA on the question of venue, for issues such as administrative convenience and the availability of witnesses are matters committed to their discretion. The IJ, however, did not decide the venue question because he wanted to resolve the issues of deportability and Yesil's eligibility for section 212(c) relief first. Once he deter-

---

14. *See Goncalves*, 6 F.3d at 834: "[T]he alien remains free to appeal the denial of discretionary relief to the courts. The entry of the Board's final order does not 'change' his 'status' for this purpose (if it did, it would moot the appeal by making it impossible for the alien to receive 'discretionary relief' even if he wins)."

mined that Yesil was deportable and was not eligible for section 212(c) relief, he denied the venue motion essentially as moot, without ever considering the venue question on the merits. The BIA affirmed.

The IJ's refusal to consider the venue motion on the merits might very well have determined the outcome of the case, given the lack of consensus in the circuits on different important legal issues. The IJ engaged in circular reasoning in such a manner as to deprive Yesil of the right to have his venue motion decided on the merits, possibly to his great detriment. The IJ declined to rule on the venue question because he wanted first to rule on deportability and eligibility for the waiver. Yet, he declined to apply Second Circuit law because, in his view, the case arose outside the Second Circuit. (R. 206). Moreover, because he did not apply Second Circuit law, he found that Yesil was not eligible for the waiver. Finally, because he concluded that Yesil was not eligible for the waiver, he found that it was unnecessary to decide the venue question. If, of course, the IJ had decided the venue question first and agreed with Yesil that a change in venue to New York was appropriate, Second Circuit law would have been applied and there could very well have been a different result.

## CONCLUSION

For the foregoing reasons, the petition is granted. This case is remanded to the BIA for consideration on the merits of Yesil's application for section 212(c) relief and for further proceedings not inconsistent with this opinion. The venue question is to be resolved before the application for section 212(c) relief is decided.

SO ORDERED.