Angelo **GROCCIA**

v.

**Janet RENO, et al.**

**No. Civ.A. 99–12363–RGS.**

United States District Court, D. Massachusetts.

March 24, 2000.

Prasant D. Desai, Desai & Graves, Boston, MA, for plaintiff.

Brenda M. O'Malley, Dept. of Justice, Civil Div., Washington, DC, for defendants.

## MEMORANDUM OF DECISION AND ORDER ON A PETITION FOR WRIT OF HABEAS CORPUS

STEARNS, District Judge.

Petitioner Angelo Groccia is a citizen of Italy. Groccia immigrated to the United States on December 1, 1955, when he was six years old. On February 1, 1996, Groccia pleaded guilty in the Worcester Superior Court to possession of cocaine with the intent to distribute. Groccia thus became automatically deportable for having been convicted of a crime involving a controlled substance and also for having been convicted of an aggravated felony. See 8 U.S.C. § 1227(a)(2)(B)(i); 8 U.S.C. § 1227(a)(2)(A)(iii). On July 5, 1996, the Immigration and Naturalization Service (INS) served Groccia with an Order to Show Cause.[1]

On August 7, 1997, the INS served Groccia with a Notice to Appear.[2] The Notice was served on Groccia at MCI–Shirley where he had been incarcerated for the drug crime. On October 19, 1997, a removal hearing was held by video conference before an Immigration Judge. The judge ordered Groccia deported. Groccia appealed to the Board of Immigration Appeals (BIA) which on September 29, 1998, dismissed his appeal. The BIA held that Groccia was ineligible for § 212(c) relief because his deportation proceeding[3] had commenced after the IIRIRA transitional rules had gone into effect.[4] The BIA also noted that it had no authority to rule on Groccia's claim that the restrictions on deportee eligibility for § 212(c) waivers imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) (effective April 24, 1996) violated the Equal Protection Clause.[5]

AEDPA denied § 212(c) relief to persons placed in deportation proceedings after being convicted of most drug crimes. See AEDPA § 440(d). However, AEDPA's silence as to whether § 440(d) was to have retroactive effect led the First Circuit in *Goncalves v. Reno*, 144 F.3d 110, 126–128 (1st Cir.1998), to conclude that it did not, at least with respect to deportable aliens who had § 212(c) petitions pending on the date of AEDPA's enactment. Cf. *Almonte v. Reno*, 27 F.Supp.2d 106, 109 (D.Mass.1998) (extending the availability of § 212(c) relief to deportable aliens who prior to AEDPA's enactment had given INS unmistakable notice of their intent to apply for such relief).

A second complexity introduced by Congress's reworkings of the INA involves the availability of judicial review of deportation orders. Insofar as relevant here, AEDPA abolished direct judicial review of "any final order" of deportation entered "by

1. On September 30, 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). IIRIRA repealed § 212(c) of the Immigration and Naturalization Act (INA) which afforded the prospect of discretionary relief from deportation to certain otherwise deportable aliens. The repeal, however, applies only to persons placed in deportation proceedings after April 1, 1997, the effective date of IIRIRA's "permanent rules." A deportation proceeding commences when an Order to Show Cause is served. *Wallace v. Reno*, 194 F.3d 279, 287 (1st Cir.1999).

2. "Notice to Appear" is IIRIRA nomenclature for the old INA Order to Show Cause. The documents serve the same purpose.

3. Deportation proceedings are now referred to as "removal" proceedings. See 8 U.S.C. § 1229a.

4. The BIA deemed the service of the Notice to Appear to have triggered the formal commencement of the deportation proceedings, rather than the earlier service of the Order to Show Cause. The BIA's decision predated *Wallace*.

5. Groccia argued that this was so because of the somewhat more lenient treatment AEDPA extended to excludable aliens as opposed to deportable aliens. The issue was decided adversely to Groccia in *Almon v. Reno*, 192 F.3d 28 (1st Cir.1999).

reason of" a conviction for most drug crimes. AEDPA § 440(a). The abolition of direct review took effect on AEDPA's passage. *Kolster v. INS*, 101 F.3d 785, 790 (1st Cir.1996). Although AEDPA also repealed the explicit habeas provision of the old INA, that specific repeal was held by *Goncalves* not to constitute a repeal of the general habeas authority of the federal courts. See 28 U.S.C. § 2241.

■ Shortly after *Goncalves*, the Supreme Court decided *Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). *Arab American* involved an interpretation of § 306(a) of IIRIRA, codified at 8 U.S.C. § 1252(g), which restricts judicial intervention in pending and future deportation proceedings by channeling the review of final deportation orders to the Courts of Appeals. Section 1252(g) also strips the federal courts of jurisdiction to review any decision of the Attorney General arising from the exercise of her discretion to "commence proceedings, adjudicate cases, or execute removal orders." *American–Arab* held that the jurisdiction stripping provision applied only to a narrow class of discretionary determinations by the Attorney–General. Because the Supreme Court did not reach the issue whether § 2241 habeas authority survived the enactment of § 1252(g) (other than to note a split on the subject among the Circuits) most courts have since held that it does. See *Wallace*, 194 F.3d at 285 & n. 6. Because *Wallace* is the controlling authority in this Circuit, I conclude contrary to the government's position, that this court has jurisdiction to entertain Groccia's § 2241 petition.[6]

*Wallace*, decided in the wake of *Arab–American*, essentially confirmed a narrow reading of the Supreme Court's holding in that case, suggesting that it in fact strengthened *Goncalves'* holding that § 2241 habeas authority had survived the

enactment of IIRIRA § 1252(g). Of more immediate interest is the holding in *Wallace* expanding the availability of pre-AEDPA waiver relief to all aliens whose deportation proceedings had commenced prior to AEDPA's effective date (April 24, 1996). *Wallace* based this expansion on the reasonable assumption that "the waiver rules—once proceedings have begun—become a common focus of expectation and even reliance. The alien's choice of strategy in [a deportation] proceeding may well be affected by the chances of waiver, so one should be cautious about changing the rules after the game has begun." *Wallace*, 194 F.3d at 287.

■ *Wallace*, however, provides no succor to Groccia. His deportation proceeding began on July 5, 1996, two months after AEDPA became law, thus placing him squarely under IIRIRA's transitional rules. Perhaps recognizing this, Groccia argues that the holding in *Wallace* should be expanded even further, by making pre-AEDPA § 212(c) relief available to aliens whose guilty pleas were entered prior to AEDPA's enactment, even though their deportation proceedings began after its effective date. Groccia's argument is premised on the supposition that an alien's pre-AEDPA decision to plead guilty might have been influenced by the (albeit) contingent prospect of being found eligible for later relief from deportation. The contention is not altogether frivolous. Indeed, it persuaded the district court in *Wallace*, although the First Circuit declined to address it because the aliens who figured in the *Wallace* appeal were (unlike Groccia) placed in deportation proceedings prior to April 24, 1996. This court, however, did venture to decide the issue in *Almonte*, and I see reason since *Wallace* to believe that the holding in *Almonte* was correct. Consequently, I quote at length from that opinion.

---

**6.** The government's argument that it does not depends on the mistaken premise that Groccia's deportation proceeding began when the

Notice to Appear was served, that is, after IIRIRA's permanent provisions came into effect on April 1, 1997.

Judge Gertner's opinion [for the district court in *Wallace* ] is lengthy, but her essential argument rests on the statutory practice in some states, among them Massachusetts, of requiring judges during a plea colloquy to inform a defendant that a conviction may have immigration consequences.

At the moment of indictment, then, a non-citizen criminal defendant would most likely have been informed of and had good reason to consider the immigration consequences of a guilty plea. If the attorney had fulfilled her obligations, a defendant such as Wallace should have factored into those considerations his eligibility for § 212(c) relief and that a majority of those who sought it had succeeded.

There is thus a direct and meaningful connection between the operation of AEDPA's new rule barring § 212(c) relief to many alien criminal offenders and a past event—those same offenders' voluntary decision to waive their right to a trial and plead guilty. AEDPA's bar to § 212(c) relief attached new legal consequences to the guilty pleas, after the fact. To apply those consequences now would offend principles of fair notice and respect for reasonable reliance and settled expectations. See *Landgraf [v. USI Film Products]*, 511 U.S. [244,] 270, [114 S.Ct. 1483, 128 L.Ed.2d 229]. The presumption against retroactivity therefore applies to bar the application of § 440(d) whose deportability rests on guilty pleas, entered prior to April 24, 1996. Just as the First Circuit held that the Congress may not place additional burdens on Goncalves' completed act of applying for § 212(c) relief, so too it may not place additional burdens on Wallace's completed act—to waive his trial rights and plead guilty.

While this approach is clear in its application, it is troubling in several respects. First, it assumes that aliens have a cognizable interest in the availability of section 212(c) relief, which the First Circuit, and other Courts of Appeals, have ruled they do not. See *Kolster*, 101 F.3d at 789. Thus, even assuming that over time defense counsel have as a matter of routine practice advised their alien clients that deportation might be avoided by a section 212(c) waiver, neither that advice nor the availability of a section 212(c) hearing creates any substantive right in an otherwise deportable alien. Id. at 789. Moreover, much of counsel's advice in this regard would be retroactively erroneous in light of the Immigration Act of 1990 (which precludes the Attorney General from granting waivers of deportation to aliens who have served a five year sentence for an aggravated felony). In *Barreiro v. INS*, 989 F.2d 62, 64 (1st Cir.1993), the First Circuit explicitly held that the 1990 restrictions on the availability of section 212(c) hearings, when applied to aliens whose convictions predated the passage of the Immigration Act, did not violate the presumption against retroactivity. The reasons for the holding were two. First, that it was inconceivable (as in this case) that Congress in enacting "so substantial a stricture" would have intended to create a safe haven for large numbers of persons whose past conduct now made them ineligible for section 212(c) relief. The second reason, while not as clearly expressed, was based on the principle, recognized in *Landgraf*, that "a statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, ... or upsets expectations based in prior law." 511 U.S. at 269, [114 S.Ct. 1483]. Rather, whether a particular rule operates retroactively must be decided "at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." Id. at 270, [114 S.Ct. 1483]. In the context of this

case, it is worth remembering that the "relevant past event" targeted by Congress in AEDPA was not the alien's decision to plead guilty, but rather the underlying criminal conduct that made him potentially deportable. To focus on the alien's plea, rather than his crime, is to lose sight of a fundamental point, that AEDPA does not impose a new penalty for the alien's *past* conduct, it rather closes a door to his *future* prospects of remaining in the United States. While there is certainly a connection between the past event (the crime) and Congress's judgment in the matter, the extent of the change in the law is not that great. As the Third Circuit cogently stated in *Scheidemann v. INS*, 83 F.3d 1517, 1523 (3d Cir.1996):

> [i]n this case, the consequences of petitioner's criminal conduct were clear at the time of that conduct and they remain unchanged today. He was subject to possible criminal sanctions and deportation. The only relevant change in the law related to the permissible scope of the Attorney General's discretion to grant relief from one of those consequences. Like statutes altering the standards for injunctive relief, this change has only a prospective impact. It is not designed to remedy the past but only to affect petitioner's future status with respect to the legality of his presence in the United States ... Given the facts that petitioner's pre–1987 conduct clearly subjected him to deportation as well as criminal sanctions, and that § 212(c), as it then existed, offered relief from the former only at the unfettered discretion of the Attorney General, petitioner does not, and could not, contend that his conduct was undertaken in reliance on the then current version of § 212(c).

*Almonte,* 27 F.Supp.2d at 107–109 (footnotes omitted). Accord *Jurado–Gutierrez v. Greene,* 190 F.3d 1135, 1152 (10th Cir. 1999); *Requena–Rodriguez v. Pasquarell,* 190 F.3d 299, 308 (5th Cir.1999).

The position taken in *Almonte* receives at least indirect support in a post-*Wallace* First Circuit decision, *United States v. Gonzalez,* 202 F.3d 20 (1st Cir.2000). *Gonzalez* involved an attempt by a Cuban national whose convictions rendered him deportable under the "aggravated felony" provisions of the IIRIRA to withdraw his guilty pleas. Neither Gonzalez nor his attorney had apprehended the immigration consequences of his pleas (nor did the judge address them during the plea colloquy). In response to Gonzalez's claim that his attorney had thus rendered ineffective assistance, the Court stated:

> even if we were to assume—despite a dearth of evidence on the subject—that Gonzalez would not have pleaded guilty had he known of his plea's immigration consequences, we still would not regard [his lawyer's] representation as constitutionally defective. Along with numerous other courts of appeals, we have held that deportation is only a *collateral* concomitant to criminal conviction. *See, e.g., United States v. Quin,* 836 F.2d 654, 655 (1st Cir.1988)....
>
> In *Quin,* the defendant had "waived jury and acceded to a bench trial in ignorance of the deportation consequences of a guilty finding due to the failure of his counsel to inform him thereof; [defendant argued] that this constituted constitutionally ineffective counsel, and that he [was thus] entitled to start over." *Quin,* 836 F.2d at 655. We disagreed, noting that as a "collateral consequence" of conviction, deportation was "legally irrelevant, even as to an outright guilty plea." *Id.*

*Gonzalez,* 202 F.3d at 25. The Court then continued:

> Although Gonzalez recognizes the doctrine of collateral consequences, he contends that "those cases relying [on it] may not have aged well." This claim is grounded only in conclusory assertions that, since IIRIRA's passage, "various routes of judicial and administrative re-

lief" that were once available to deportable felons are foreclosed, and that now, his deportation—or indefinite administrative detention—is "to be expected virtually by operation of law."

*Id.*, 202 F.3d at 26. This argument the Court found unpersuasive, explaining that:

> IIRIRA did not so substantially alter the treatment of individuals in his situation as to warrant reconsideration of whether deportation is still a collateral consequence of conviction. Even prior to IIRIRA's passage, any alien who committed an aggravated felony was considered deportable, *see* 8 U.S.C. § 1251(a)(2)(A)(iii) (1995), *amended by* 8 U.S.C. § 1227 (Supp. II 1996), and the Attorney General was directed to apprehend any such alien upon his or her release from prison, *see* 8 U.S.C. § 1252(a)(2)(A) (1995), *amended by* 8 U.S.C. § 1226 (Supp. II 1996). Without minimizing the significance of the IIRIRA, we note that it is only relevant to this case insofar as it curtailed the Attorney General's discretion to release such aliens.

*Id.*[7]

### ORDER

For the foregoing reasons, the petition for writ of habeas corpus is *DISMISSED.* The stay of removal will be continued for a period of three weeks, unless sooner terminated by an order of this court or extended by an order of the Court of Appeals.

SO ORDERED.

---

**7.** The case brought to the court's attention by petitioner's counsel after the briefs were filed, *Alanis–Bustamante v. Reno,* 201 F.3d 1303 (11th Cir.2000), does support petitioner's jurisdictional arguments. It does not, however, speak to his claim for relief as the petitioner in *Alanis–Bustamante* (as in *Wallace* ) was served with an Order to Show Cause prior to AEDPA's effective date.