**Dwight Washington MATTIS,**
Petitioner,

v.

**Janet RENO, Attorney General; Doris Meissner, Immigration and Naturalization Service; Immigration and Naturalization Service; Department of Justice; and Steve Farquharson, District Director, Respondents.**

Civil Action No. 98–11781–WGY.

United States District Court,
D. Massachusetts.

March 31, 1999.

Allan M. Tow, Boston, MA, for petitioner.

Frank Crowley, Immigration & Naturalization, Special Assistant U.S. Attorney, Boston, MA, Karen Ann Hunold, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for respondents.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

The petitioner, Dwight W. Mattis ("Mattis"), is a legal permanent resident alien subject to deportation because of his prior criminal convictions. *See* 8 U.S.C. § 1251(a)(2)(B)(i) (an alien convicted of a controlled substance offense is deportable); 8 U.S.C. § 1251(a)(2)(A)(iii) (an alien convicted of an aggravated felony is deportable).[1] Prior to April 24, 1996, under section 212(c) of the Immigration and Nationality Act ("INA"), Mattis would have been eligible to apply for a discretionary waiver from deportation. *See* 8 U.S.C. § 1182(c) (1995).[2] However, section 440(d) of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), an amendment to section 212(c) of the INA, enacted in 1996, rendered Mattis ineligible for such a waiver. *See* AEDPA, Pub.L. No. 104–132, Title IV, § 440(d), 110 Stat. 1214, 1277.

Mattis filed a writ of habeas corpus with this Court alleging that the AEDPA was improperly applied retroactively to his case and that the AEDPA violated his equal protection guarantees. This Court will address each of Mattis' claims.

---

1. For aliens placed in immigration proceedings on or after April 1, 1997, these provision have been recodified at 8 U.S.C. §§ 1227(a)(2)(B)(i) and 1227(a)(2)(A)(iii).

2. Section 212 of the INA states that "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted at the discretion of the Attorney General.... The first sentence shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of a least 5 years." 8 U.S.C. § 1182(c) (1995).

## Facts

Mattis, a native and citizen of Jamaica, entered the United States as an immigrant on February 11, 1989. Thereafter, consistently residing in the United States as a legal permanent resident, Mattis married an American citizen, had a child, and maintained employment as a manager of two beauty salons in Springfield, Massachusetts. Between June 1991 and September 1995, Mattis received five criminal convictions, including four controlled substance offenses and one conviction for rape of a child for which he received a term of imprisonment of two years and six months. On January 22, 1997, pursuant to 8 U.S.C. § 1251(a)(2)(B)(i) and 8 U.S.C. § 1251(a)(2)(A)(iii), the Immigration and Naturalization Service ("INS") initiated deportation proceedings against Mattis by issuing an Order to Show Cause. *See In re Mattis,* No. A 41 462 247 (Imm.Ct. Sept. 8, 1997), Resp't Mem., Attach. B. On September 8, 1997, the INS conducted a deportation hearing during which Mattis attempted to apply for a discretionary waiver from deportation. *See id.* Because the recently enacted AEDPA disqualified Mattis from applying for section 212(c) relief, however, the Immigration Judge ruled Mattis ineligible for such relief and ordered him deported. *See id.* The Board of Immigration Appeals ("BIA") dismissed Mattis' appeal, ruling him statutorily ineligible for section 212(c) relief. *See id.* at Attach. C.

## Discussion

Prior to the enactment of the AEDPA on April 24, 1996, section 212(c) of the INA authorized the Attorney General to grant a discretionary waiver of deportation to an otherwise deportable legal permanent resident who had an unrelinquished domicile of at least seven years in the United States. *See* 8 U.S.C. § 1182(c) (1995). This discretionary waiver was available to any deportable alien unless she had committed an aggravated felony and had served for such felony a term of imprisonment of at least five years. *See id.* On April 24, 1996, Congress passed the AEDPA. Section 440(d) of the AEDPA, an amendment to section 212(c) of the INA, greatly restricted the Attorney General's authority to grant discretionary waivers by expanding the categories of criminal convictions that would render an alien ineligible for discretionary relief. Under section 440(d), any legal permanent resident who has committed an aggravated felony, a controlled substance offense, certain firearm offenses, convictions of two crimes of moral turpitude, or other miscellaneous offenses is ineligible to apply for a discretionary waiver of deportation.[3] *See* AEDPA § 440(d), 110 Stat. 1214, 1277. In the present case, although Mattis would have been eligible for relief under section 212(c) of the INA, the more stringent standard of section 440(d) of the AEDPA eliminates the possibility of relief from deportation.

Recently, the Court of Appeals for the First Circuit considered whether section 440(d) of the AEDPA applies retroactively to applications for relief pending at the time the statute was enacted. *See Goncalves v. Reno,* 144 F.3d 110 (1st Cir.1998). The court concluded that the statutory provision should not apply retroactively, and used the analysis set forth in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), as a guide. *See id.* at 127–28. Mattis urges this court to extend the holding of *Goncalves* to include aliens who, like himself, committed the crimes making him eligible for deportation before the enactment of the AEDPA but who did not have pending applications before the enactment of the AEDPA. For the following reasons, this Court is unwilling to extend the *Goncalves* holding to such an extreme.

**3.** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 expressly repealed section 212 of the INA as amended by AEDPA section 440(d) thus barring any discretionary relief for deportable and excludable aliens. This statute took effect on April 1, 1997.

### Retroactivity

The starting point in this discussion is the analysis used in *Landgraf*. In *Landgraf*, the Supreme Court set forth guidelines to assist a court in determining whether newly enacted statutes should be applied retroactively. First, courts should look to the text and legislative history of the statute. *See Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. If legislative intent is clear, then courts are expected to abide by the intent of Congress. *See id.* Absent clear intent, however, a court must determine whether or not a statute has a retroactive effect. *See id.* If a retroactive effect is present, then the court must use the traditional rule that mandates only prospective application of the statute in question. *See id.*

Using the first prong of the *Landgraf* analysis, the First Circuit in *Goncalves v. Reno* recently held that section 440(d) of the AEDPA should not be applied retroactively to pending waiver applications. *See Goncalves*, 144 F.3d at 134. In looking at the complete text of the AEDPA, the court concluded that if Congress had intended section 440(d) to apply retroactively, it would have included an express retroactivity provision as it had done in other sections of the AEDPA. *See id.* at 131. This conclusion was further bolstered by the legislative history of the statute. Although the original Senate version included a retroactivity provision in section 440(d), this provision was deleted from the final draft of the bill that was ultimately passed. *See id.* The legislative history in conjunction with the statutory text of the AEDPA illustrates a clear legislative intent to provide prospective application of section 440(d) of the AEDPA in cases where there is a pending waiver application. *See id.* Since the court was able to dispose of the case by looking only to the statutory text and legislative history, the court did not need to determine whether a retroactive effect existed.

Subsequent to the *Goncalves* decision, this Court considered whether section 440(d) should be applied retroactively to pending immigration cases in which a waiver application had not been filed by the date of enactment. *See Ranglin v. Reno*, 27 F.Supp.2d 262 (D.Mass.1998). In *Ranglin*, this Court extended the holding of *Goncalves* to prohibit retroactive application of section 440(d) to cases in which the INS had begun deportation proceedings against an alien but the alien had not yet filed an application for section 212(c) discretionary relief on the date of enactment. *See id.* at 266; *see also McKenzie v. Reno*, No. 97–CV–11285–DPW, slip op. at 5 (D.Mass. Dec. 10, 1998) (Woodlock, J.) (holding that section 440(d) of the AEDPA does not apply to deportation cases pending on date of enactment). In reaching this holding, this Court, like the First Circuit in Goncalves, looked to the statutory intent of Congress and determined that Congress did not intend section 440(d) to apply retroactively to pending deportation cases. *See Ranglin*, 27 F.Supp.2d at 266.

*Goncalves* and *Ranglin* have answered the question of congressional intent where the deportation proceedings were pending on the date of enactment of the AEDPA. These cases are, however, silent as to the treatment of cases like Mattis', in which the crimes were committed before the enactment of the AEDPA but the deportation proceedings had not commenced until after enactment.

Mattis asserts that Congress did not intend section 440(d) to apply to cases like his, where the conduct disqualifying a petitioner for relief occurred prior to the enactment of the AEDPA but deportation proceedings were not initiated until after enactment. In support of his position, Mattis relies on *Lindh v. Murphy*, 521 U.S. 320, 324–25, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), which held that statutes should apply retroactively only if clear congressional intent to do so is present. Mattis argues that since *Goncalves* did not find clear congressional intent to apply section 440(d) retroactively to pending cases, *Lindh* requires that the statute should also

not be applied retroactively to cases in which the crimes were committed before the enactment of the Act. However, while it is true that Mattis committed the disqualifying crimes prior to enactment, it is unlikely that Congress intended the application of the statute only to those aliens who committed crimes after the enactment of the AEDPA. Mattis' interpretation of the statute is unreasonable as it would render the statute inoperative for years after enactment. It is hard to believe Congress intended such a result. *See Barreiro v. INS*, 989 F.2d 62, 64 (1st Cir.1993) (noting that the petitioner's interpretation of the statute defied logic as it would leave the statute inoperative for years); *see also Stone v. INS*, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) ("[W]hen Congress acts to amend a statute, we presume it intends its amendments to have a real and substantial effect. . . .").

Although common sense indicates that Congress could not possibly intend such an unreasonable result, *Landgraf* permits the analysis to end only when there is clear congressional intent. *See Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. Given that there is no such clear intent concerning prior criminal conduct, the analysis must go further.

The second prong of the *Landgraf* analysis requires this Court to determine whether section 440(d) would have an impermissible retroactive effect on Mattis. *See id.* at 277, 114 S.Ct. 1483. If a statute would "impair rights a party possessed when he acted, increase a party's liability for past conduct . . . ." or "attach a new disability, in respect to transactions . . . already past," then a retroactive effect is present and the presumption against retroactivity should be employed. *Id.* at 269, 280, 114 S.Ct. 1483. *Landgraf* recognized, however, that "a statute does not operate 'retrospectively' merely because it is applied to a case arising from conduct antedating the statute's enactment, . . . , or upsets expectations based in prior law." *Id.* at 269, 114 S.Ct. 1483 (citation omitted).

■ Mattis claims that the application of section 440(d) to his case has an impermissible retroactive effect by adding an additional consequence to his past conduct. In support of his position, Mattis relies on *Hughes Aircraft v. United States*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), which held that an amendment to the False Claims Act permitting previously barred suits by private parties on behalf of the United States government should not be applied retroactively to false claims that were filed before the enactment. Due to the additional consequence the amendment attached to previous conduct, the Supreme Court concluded that retroactive application was inappropriate. *See id.* at 951, 117 S.Ct. 1871. In Mattis' case, however, the ineligibility to apply for a discretionary waiver to deportation cannot be considered an additional consequence. Rather, the eligibility of a waiver was simply one form of relief from the true consequences of his crime, imprisonment and deportation. *See Scheidemann v. INS*, 83 F.3d 1517, 1523 (3d Cir.1996) ("In this case, the consequences of petitioner's criminal conduct were clear at the time of that conduct and they remain unchanged today. He was subject to possible criminal sanctions and deportation.") Moreover, whereas in *Hughes* the statute eliminated a statutory defense to a potential cause of action, the opportunity to apply for a discretionary waiver is not a defense to deportability. This is only an application available to a certain group of aliens that the Attorney General may grant in her discretion.

■ Mattis further asserts that section 440(d) has an impermissible retroactive effect by impairing his substantive right to apply for a discretionary waiver. In certain circumstances, of course, the availability of relief can properly be deemed a substantive right. Indeed, the First Circuit in *Goncalves* and this Court in *Ranglin* have explicitly stated that, in those particular circumstances, the availability of relief is a substantive right. The present case is, however, distinguishable in one

significant way. In both *Goncalves* and *Ranglin*, the alien was already embroiled in deportation proceedings when the AEDPA was enacted. In that situation, the alien's expectation and reliance on that one form of relief is such that it can properly be deemed a substantive right. In contrast, in the present case, the INS had not initiated deportation proceedings until nine months after enactment. Therefore, there cannot be a reliance interest in potential relief from an event that may or may not occur. *See Kolster v. INS*, 101 F.3d 785, 789 (1st Cir.1996) (noting that "aliens do not have a cognizable reliance interest in the availability of discretionary section 212[c] relief"); *see also Almonte v. Reno*, 27 F.Supp.2d 106, 107 n. 3 (D.Mass.1998) (Stearns, J.) (commenting that the availability of a section 212[c] hearing does not create any substantive right in an otherwise deportable alien).

To be clear, this Court is not retreating from the prohibition of retroactive application of this statute to cases in which the deportation proceedings were pending on the date of enactment of the AEDPA. Rather, this Court is simply unwilling to extend the prior decisions rendered on this issue to include all cases in which the crimes rendering an alien eligible for deportation occurred before the enactment of the statute. Given that the application of section 440(d) does not attach an additional consequence to Mattis' prior conduct nor does it impair a substantive right possessed by Mattis, this Court concludes that section 440(d) of the AEDPA was properly applied to Mattis' case.[4] For the foregoing reasons, Mattis' petition is denied on this ground.

**Equal Protection**

 Mattis also alleges that the application of the AEDPA to his case is a violation of his equal protection guarantees because of the arbitrary distinction drawn between excludable and deportable aliens. Indeed, section 440(d) of the AEDPA refers specifically and exclusively to deportable aliens. *See* AEDPA § 440(d), 110 Stat. 1214, 1277. Therefore, according to the text of the statute, excludable aliens are outside the section 440(d) eligibility restrictions placed on deportable aliens.

Under the equal protection clause, distinctions in the law among classes of individuals must have a rational basis. *See Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Thus, the classification drawn "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation of the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Stanton v. Stanton*, 421 U.S. 7, 14, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) (citation and internal quotation marks omitted).

In order to explore this issue fully, more background information is necessary. When section 212(c) of the INA was enacted, it referred and was applied specifically and exclusively to deportable aliens. However, in *Francis v. INS*, 532 F.2d 268 (2d Cir.1976), the Second Circuit concluded that this provision was unconstitutional and ordered that section 212(c) relief be available to deportable and excludable aliens alike. The court explained, "[r]eason and fairness would suggest that an alien whose ties with this country are so strong that he has never departed after his initial entry should receive at least as much consideration as an individual who may leave and return from time to time." *Id.* at 273.

---

4. Recently, a district court in the district of Puerto Rico reached the same conclusion on this precise issue. In *Walters v. Reno*, 16 F.Supp.2d 166 (D.P.R.1998), the court held that, despite the fact that the petitioner's crimes were committed before the enactment of the AEDPA, section 440(d) applied to the petitioner because deportation proceedings had not yet begun when the AEDPA was enacted. In reaching this decision, the court relied heavily on *Barreiro v. INS*, 989 F.2d 62 (1st Cir.1993), which held that the petitioner's disqualifying conduct that occurred before the enactment of the Immigration Act did not prevent its application to the petitioner.

Upon enactment, section 440(d) of the AEDPA once again referred only to deportable aliens. Although initially Immigration Judges applied this section to both excludable and deportable aliens, the BIA in *In re Fuentes–Campos*, Int.Dec. 3318, 1997 WL 269368 (May 14, 1997), concluded that section 440(d) of the AEDPA should apply only to deportable aliens. From this date forward, the INS continued to grant discretionary waiver hearings in exclusion proceedings only.[5]

The burden is on Mattis, of course, to show that his equal protection rights were violated. Thus, for Mattis' claim to succeed, another application for section 212(c) relief must have been granted while Mattis' was denied. On May 14, 1997, Mr. Fuentes–Campos, a resident alien in exclusion proceedings, was granted a section 212(c) discretionary hearing. *See id.* at 2. Therefore, by granting this hearing, the BIA treated Mattis differently from an excludable alien when it ruled him ineligible to apply for section 212(c) relief.

Mattis therefore vigorously argues that there is no rational basis for treating two aliens convicted of exactly the same crime differently simply because one has chosen to leave the country and the other has not.[6] District courts considering this issue agree. *See Almon v. Reno*, 13 F.Supp.2d 143, 146 (D.Mass.1998) (Harrington, J.) (ruling that applicant's equal protection rights were violated by the BIA's interpretation of the AEDPA to permit relief for aliens in exclusion but not deportation proceedings); *Vargas v. Reno*, 966 F.Supp.

1537, 1547 (S.D.Cal.1997) (ruling that there is no legitimate governmental interest in drawing a distinction between these two classes of aliens).

Nonetheless, the congressional judgment to limit section 440(d)'s restrictions to "deportable" aliens must be upheld so long as it is based upon any "facially legitimate and bonafide" reason. *Fiallo v. Bell*, 430 U.S. 787, 794, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). It is well established that under this minimal standard of review, the government has no obligation to produce evidence to sustain the rationality of a statutory classification. *See Heller v. Doe*, 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("A classification does not fail rational-basis review because it 'is not made with mathematical nicety or ... it results in some inequality.'") (citation omitted); *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"). Once a facially legitimate and bonafide reason is found, whether articulated by Congress or not, this Court must uphold the statute as constitutional. *See Fiallo*, 430 U.S. at 794–95, 97 S.Ct. 1473; *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir.1995).

In limiting section 440(d)'s restrictions to "deportable" criminal aliens, Congress advanced an articulated legislative purpose to expedite the deportation of criminal aliens who pose an immediate danger to

---

**5.** To further complicate matters, on April 1, 1997, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Among other things, this Act expressly repealed section 212(c) of the INA as amended by AEDPA section 440(d), thus barring any discretionary relief for either deportable or excludable aliens. *See* IIRIRA § 304(b), Pub.L. 104–208, 110 Stat. 3009. The IIRIRA did not take effect until April 1, 1997 and did not affect deportation proceedings pending before that date. *See* IIRIRA § 309(c)(1). Therefore, in order for Mattis to maintain his equal protection claim here, his deportation proceedings must have been

pending on April 1, 1997 and have remained under advisement on May 14, 1997. Mattis falls within this window since the INS issued the order to show cause on January 22, 1997 and the Immigration Judge issued a finding on September 8, 1997.

**6.** Section 304(a)(7) of the IIRIRA consolidated deportation and exclusion proceedings into a single category of removal proceedings thus illustrating Congress' awareness of the distinction between the two categories of aliens. *See* IIRIRA § 304(a)(7).

the American public.[7] Given that deportable aliens (in the United States) overwhelmingly outnumber excludable aliens (seeking to enter the United States),[8] Congress could determine that deportable criminal aliens pose a more acute problem and direct its legislative efforts accordingly. With all respect to my colleagues who have reached a contrary conclusion, this Congressionally drawn distinction must be upheld.[9]

## Conclusion

For the foregoing reasons, Mattis' petition for habeas corpus is DENIED, as is his motion for a stay of deportation.

---

7. *See* H.R.Conf.Rep. No. 104–518, at 119 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 952 (AEDPA § 440 was intended to enhance the "ability of the United States to deport criminal aliens"); 141 Cong.Rec. S7822–23 (daily ed. June 7, 1995) (a conservative estimate of the number of criminal aliens residing in the United States is 450,000; an estimated twenty to twenty-five percent of all federal prison inmates are non-citizens; seventy percent of aliens convicted of felonies commit a second crime).

8. *See* H.R.Rep. No. 104–469(I) (1996) (1996 WL 168955 at *384–85, reporting that the INS in 1995 removed a total of approximately 32,000 criminal aliens—29,255 arising from deportation cases and 2,738 from exclusion cases); *U.S. Department of Justice, 1995 Statistical Yearbook of the Immigration and Naturalization Service* 162 (1997) (reporting that in fiscal year 1994, there were 39,830 deportations and 5,678 exclusions).

9. [A] legislature traditionally has been allowed to take reform "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," ... and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.

*McDonald v. Board of Election Comm'rs of Chicago,* 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (quoting *Williamson,* 348 U.S. at 488–89, 75 S.Ct. 461); *Semler v. Oregon State Bd. of Dental Examiners,* 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086 (1935) (noting that the legislature need not "strike at all evils at the same time").

*Francis,* 532 F.2d at 271–73, does not support petitioner's equal protection claim. In *Francis,* the court held that the Board could not rationally distinguish between *deportable* aliens who had left the country and returned, and *deportable* aliens who had never left. *Francis* does *not* stand for the proposition that Congress cannot rationally extend discretionary section 212(c) relief to excludable aliens while denying it to deportable aliens.