**Francisco VASQUEZ, Petitioner,**

v.

**Janet RENO, Attorney General; Doris Meissner, Commissioner of the Immigration and Naturalization Service Steven J. Farquharson, District Director of Immigration and Naturalization Service, Respondents.**

**No. CIV. A. 00–10657–WGY.**

United States District Court,
D. Massachusetts.

April 21, 2000.

James C. Dragon, Lowell, MA, for Petitioners.

Frank Crowley, Immigration & Naturalization, Special Assistant U.S. Attorney, Boston, MA, for Respondents.

### MEMORANDUM

YOUNG, Chief Judge.

#### I. *Introduction*

The Petitioner, Francisco Vasquez ("Vasquez") petitioned this Court for a Writ of Habeas Corpus pursuant to 28 U.S.C § 2241, claiming that he is being unlawfully detained by the government in violation of the laws of the United States. The government moved to dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(6) for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue.

On April 18, 2000, the Court heard oral arguments on both the procedural bars and the merits of the petition. At that time the Court ruled that it has both subject matter and personal jurisdiction and that venue properly lies in the District of Massachusetts. At the conclusion of the hearing, however, the Court dismissed the petition on the merits. Here follows a summary of the Court's reasoning.

#### II. *Factual and Procedural Background*

Vasquez is a twenty-seven year old native and citizen of the Dominican Republic who was admitted as a lawful, permanent resident on January 15, 1987. On October 21, 1993, Vasquez was convicted in Massachusetts for receiving stolen property. He served six months of an eighteen-month sentence. Based on this conviction, removal proceedings were brought against Vasquez by an Order to Show Cause dated February 2, 1999.[1] He was originally detained in Massachusetts but within days of his arrest he was transferred to the Federal Detention Center in Oakdale, Louisiana. It was there that the removal proceedings and subsequent appeals took place. Because he met the statutory definition of an "aggravated felon," he was ordered removed to the Dominican Republic on September 27, 1999 pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii). Through his attorney, Vasquez filed the necessary appeals which were denied on March 6, 2000.[2] He was

1. The Immigration and Naturalization Service originally brought removal proceedings based on a 1994 controlled substance conviction. After commencement of the initial removal proceedings, however, petitioner mounted a collateral attack in the state courts and, as so frequently happens when the federal consequence of a state conviction becomes apparent, the Massachusetts District Court vacated the conviction. New removal charges were brought against Vasquez based on his 1993 conviction.

2. It is unclear from the record whether Vasquez formerly asked the Bureau of Immigration Appeals ("BIA") for a discretionary waiver pursuant to former section 212(c) of the Immigration and Naturalization Act. Given

scheduled for removal on April 5, 2000 and filed an emergency stay of deportation and habeas petition in this district on April 4, 2000.

The Court granted the stay and heard initial oral arguments on April 5, 2000. At that time the government disputed this Court's subject matter jurisdiction to hear the petition as well as claiming lack of personal jurisdiction over the custodian and improper venue. Because of the unsettled law in this area, the Court took the matter under advisement and sought additional oral argument on April 18, 2000.

Vasquez's habeas petition contends that he is eligible for section 212(c) discretionary relief. Prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (1996), aliens facing exclusion or deportation could seek a discretionary waiver from the Attorney General. Although an alien had no legal right to stay in the country, he was entitled to apply for a waiver and ask the Attorney General, in the exercise of her discretion, to allow him to remain here. In 1996, the availability of discretionary waivers was eliminated for individuals who, like Vasquez, had committed certain crimes. *See* IRRIRA § 304(b).[3] The retroactive application of this provision to individuals embroiled in deportation proceedings prior to the effective dates of the amendments has been resolved in this circuit. *See Wallace v. Reno*, 194 F.3d 279 (1st Cir.1999); *Goncalves v. Reno*, 144 F.3d 110 (1st Cir.1998). What remains unresolved by circuit precedent is whether the amendments prevent an alien, convicted of a crime prior to 1996 yet not involved in removal proceedings

until after April 1, 1997, from seeking discretionary relief.

While the merits of this case present complex and serious questions, it is the procedural issues that are at the center of this dispute. In enacting AEDPA and IIRIRA, Congress severely restricted the judicial review available for aliens ordered removed and may have extinguished such review altogether in the district courts. *See* 8 U.S.C. § 1252. The extent of the restriction is the source of significant controversy in the courts. The government has prepared a gauntlet of jurisdictional traps through which a petitioner must run prior to having the merits of his claim heard. In the case at bar, the government contends that 8 U.S.C. § 1252 effectively repealed a district court's habeas jurisdiction and channeled all challenges to removal orders to the courts of appeals. Thus, before this Court can reach the merits, the procedural issues must be addressed.

## III. *Discussion*

### A. *Subject Matter Jurisdiction*

#### 1. *Was it Repealed?*

 ·The first question that must be addressed is one that has plagued the judiciary since the inception of AEDPA and IIRIRA—whether this Court has subject matter jurisdiction to hear this habeas petition. The government contends that the judicial review process provided for by the permanent rules in 8 U.S.C. § 1252 effectively repealed a district court's habeas review pursuant to 28 U.S.C. § 2241. This is an argument that has met with success in two circuits, *see Max–George v. Reno*, 205 F.3d 194, 196 (5th Cir.2000); *Richardson v. Reno*, 180 F.3d 1311, 1313 (11th Cir.1999), but has been rejected by a third. *See Liang v. Immigration & Naturaliza-*

the current state of the law, however, it is evident that BIA would have considered Vasquez ineligible for relief.

**3.** Effective April 1, 1997, INA section 212(c) was repealed in its entirety by section 304(b) of IRRIRA. It was replaced with another

discretionary relief provision, INA section 240A, codified at 8 U.S.C. § 1229(b). That section grants the Attorney General discretion to cancel removal in certain circumstances, but not when the alien has been convicted of an aggravated felony.

*tion Service,* 206 F.3d 308, 316 (3d Cir. 2000) (Sloviter, J.). The First Circuit Court of Appeals has yet to address this difficult issue directly.

The Fifth and Eleventh Circuits held that the permanent rules eliminated habeas jurisdiction in the district courts and funneled all review into the courts of appeals. Both courts relied on the Supreme Court's decision in *American–Arab* to rule that section 1252[b][9] was an " 'unmistakable zipper clause' that 'channels judicial review' of INS 'decisions and actions' exclusively into the judicial review provided by INA." *Richardson,* 180 F.3d at 1315; *see Max–George,* 205 F.3d at 198 (section 1252(b)(9) "clearly mandates" review limited to what is provided in section 1252). The Fifth Circuit went on to conclude that the "notwithstanding any other provision of law" phrase in section 1252(a)(2)(C) "clearly precludes habeas jurisdiction under 28 U.S.C. § 2241." *Max–George,* 205 F.3d at 198. Thus, district courts in the Fifth and Eleventh Circuit no longer have jurisdiction to hear any matter regarding the removal of aliens. Jurisdiction is exclusively in the courts of appeals, or in certain instances no review is available in any court. *See* 8 U.S.C. § 1252(a)(2)(C) (providing "no court shall have jurisdiction to hear any final order of removal" in prescribed situations).

The Third Circuit viewed the reasoning and outcome in *Richardson* and *Max–George* as contrary to the dictates of the Supreme Court in *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). *See Liang,* 206 F.3d at 320. Although the government urged the *Liang* court to adopt the reasoning from the Fifth and Eleventh Circuits, the court refused, *see id.,* instead stating, "[w]e continue to believe that had Congress intended to eliminate habeas jurisdiction under § 2241, it would have done so by making its intent explicit in the language of the statute." *Id.* In so concluding, the court sought to avoid the "serious constitutional problems that would arise" if it were to adhere to its previous determination that section 1252(a)(2)(C) stripped the appeals court of jurisdiction over petitions for review by aliens with certain criminal convictions and then read the permanent rules to strip the district courts of habeas jurisdiction as well. *See id.*

While the First Circuit Court of Appeals has not ruled on subject matter jurisdiction under the permanent rules, at least one judge of the Massachusetts District Court has faced the unenviable task of divining congressional intent regarding the existence and scope of district court jurisdiction. *See Carranza v. Immigration & Naturalization Serv.,* 89 F.Supp.2d 91, 94 (D.Mass.2000). In *Carranza,* Judge Keeton held that the jurisdictional limits stated in AEDPA and IIRIRA severely restricted a district court's habeas review. *See id.* Specifically, he ruled that "[i]nsofar as Carranza is asking this court to review a final removal order, the basis of which is the BIA's determination of the inapplicability of discretionary relief under [section 212(c)], ... both the [AEDPA] and [IIRIRA] have amended the [INA] to divest this court of jurisdiction." *Id.* To the extent that Carranza was seeking habeas review of his underlying criminal conviction, however, the court concluded that it had jurisdiction "to consider 'fundamental constitutional questions.' " *Id.; see also Mahadeo v. Reno,* 52 F.Supp.2d 203, 204 (D.Mass.1999) (Stearns, J.) (agreeing with Judge Keeton's analysis, under the transitional rules, that district courts do not retain residual habeas jurisdiction under section 2241). It is unclear whether Judge Keeton viewed AEDPA and IIRIRA as effectively repealing the statutory habeas jurisdiction and leaving available only the constitutional writ.

Although the First Circuit has not dealt with the issue of habeas jurisdiction under the permanent rules, it has addressed an identical question under the transitional rules. *See Wallace v. Reno,* 194 F.3d 279 (1st Cir.1999); *Goncalves v. Reno,* 144 F.3d 110 (1st Cir.1998). The reasoning

employed in both cases parallels the reasoning adopted by the Third Circuit in *Liang*. In *Goncalves*, the court relied on *Felker* to conclude "[t]here is no question that unless it has been expressly repealed, § 2241 provides a basis for reviewing immigration decisions." 144 F.3d at 120. According to the court, *Felker* and *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1868), adopted a general rule "that any repeal of the federal court's historic habeas jurisdiction ... must be explicit and make express reference specifically to the statute granting jurisdiction." *Id.*

In *Wallace* the First Circuit faced the question of whether the recent Supreme Court decision in *American–Arab* undermined its holding in *Goncalves* and concluded it did not. *See* 194 F.3d at 283. In its opinion the court considered the government's argument that the new immigration statutes, read together, "should be treated as an implied prohibition on habeas as to deportations in general." *Id.* at 284. While the court admitted "[t]his is by no means a silly argument" and recognized that "[c]oncentrating all judicial scrutiny of deportation in the courts of appeal is certainly the general direction in which Congress has been moving," it declined to adopt such a comprehensive restriction on habeas review. *Id.* Instead it held that, under the transitional rules, deportees could challenge their removal orders through habeas "where they have no other way to assert in court that their deportation is contrary to the Constitution and laws of the United States." *Id.* at 285.

While the facts of *Goncalves* and *Wallace* were limited to review under the transitional rules, the reasoning is equally applicable to review under the permanent rules. Supreme Court precedent dictates that if Congress is going to restrict habeas review, it must do so explicitly. *See Felker*, 518 U.S. at 659, 116 S.Ct. 2333. The First Circuit applied this binding precedent in *Goncalves* and concluded that, absent explicit reference to section 2241, habeas jurisdiction survived. *See* 144 F.3d at

120. Neither the transitional rules nor the permanent rules contain an explicit repeal of section 2241. Thus, precedent compels this Court to conclude that habeas jurisdiction remains.

This conclusion is strengthened by the fact that absent review at the district court level Vasquez would "have no forum at all for the review of statutory claims" because he is deportable based upon his criminal convictions pursuant to section 1227(a)(2)(A)(iii). *Wallace*, 194 F.3d at 285. Section 1252(a)(2)(C) provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in ... 1227(a)(2)(A)(iii)." Under the facts of this case, Vasquez is unable to obtain review of his claim in a court of appeals. The First Circuit found the absence of any review untenable under the transitional rules. *See Wallace*, 194 F.3d at 285.

The lack of available review under the permanent rules in *Liang*, was a compelling factor in ruling that habeas jurisdiction survived the enactment of AEDPA and IIRIRA. *See* 206 F.3d at 321. There, the government argued that section 1252(a)(2)(C) did not eliminate *all* review by courts of appeals rather it limited review to whether a petitioner "(1) [is] an alien, (2) is removable, and (3) is removable by reason of having a statutory crime ...." *Id.* The Third Circuit was unimpressed and unpersuaded by this reasoning because it still left petitioner's constitutional and statutory claims unreviewable. *Id.* This reasoning is consistent with that employed by the First Circuit in *Wallace* when it concluded that section 1252(a)(2)(C) leaves no forum open for review of statutory claims by anyone deported because of a covered conviction. *See* 194 F.3d at 285. "This argument must fail because of the absence of any support, either in the statute or the legislative history. The government's briefs cite no provisions of AEDPA or IIRIRA that supports its reading ... and it conceded at

oral argument that there is no specific provision granting us jurisdiction over substantial constitutional claims." *Liang*, 206 F.3d at 322.

This Court is persuaded by the Third Circuit's decision in *Liang*. Moreover, given the First Circuit's reasoning in *Goncalves* and *Wallace* and absent explicit reference to 28 U.S.C. § 2241 this Court rules that AEDPA and IIRIRA did not repeal a district court's habeas jurisdiction. This conclusion is bolstered by the fact that if habeas was unavailable, then Vasquez would be without judicial review in any forum.

### 2. *What is the Scope of Available Review?*

■ While habeas jurisdiction remains intact, a question still exists regarding the scope of review available. The First Circuit discussed this issue under the transitional rules in *Goncalves*. *See* 144 F.3d at 123. The court determined that habeas included the review of statutory claims, but "[left] to future cases the task of defining the precise limit of jurisdiction under 28 U.S.C. § 2241 in immigration cases." *Id.* at 125. Implicit in this statement is the recognition that some limit does exist. As of yet, the exact parameters of habeas jurisdiction is undefined.

Several district courts have wrestled with this issue. In *Mendonca v. Immigration & Naturalization Serv.*, 52 F.Supp.2d 155 (D.Mass.1999), Judge Saris, under the transitional rules, declined to accept jurisdiction to review a discretionary decision by an immigration judge. *See id.* at 162. She distinguished the case before her from the facts of *Goncalves* because Goncalves' application for discretionary relief was never heard. *See id.* Based on this distinction and "[g]iven the sweeping language of IIRIRA's judicial review provisions and the conviction of many courts

that Congress intended the new immigration laws to narrow significantly the scope of federal courts' review of INS deportation decisions" she declined to review the decision. *Id.*

The case went up on appeal, and in a one-page, unpublished opinion[4] the First Circuit abstained from further defining the scope of habeas review. *See Mendonca v. Immigration & Naturalization Serv.*, 1999 WL 1295834, at *1 (1st Cir. Dec. 30, 1999) (unpublished opinion).

> In turn, whether federal courts in such "transitional rules" cases possess residual jurisdiction under § 2241 to review discretionary determinations of the BIA is a question not subject to ready resolution. However, the question how far habeas jurisdiction extends is one of great practical importance, and there is no reason to address it in this case. Even assuming that habeas jurisdiction does extend in this matter to abuses of discretion—and this is very much an arguendo assumption—there is nothing in this case that remotely suggests such an abuse by BIA. Accordingly, whatever the scope of habeas corpus, there is no basis for setting aside the BIA's refusal to adjust status.

*Id.*

Judge Keeton, in *Carranza*, described the scope of habeas review under the permanent rules as "newly restricted." 89 F.Supp.2d at 94. According to his analysis, review was limited to " 'fundamental constitutional questions' concerning the underlying conviction." *Id.* Because the petitioner was claiming that his counsel for the underlying conviction was constitutionally ineffective, the court determined that it had jurisdiction. *See id.*

It is unclear how Judge Keeton drew the jurisdiction line. His limitation of habeas

---

**4.** While without precedential value, *see* 1st Cir. R. 36, it is a virtual necessity to refer to unpublished First Circuit decisions to attempt to make sense of this rapidly evolving area of the law. For a full discussion of the propriety of making such reference and the weight to be accorded to such decisions, see *Giese v. Pierce Chem. Co.*, 43 F.Supp.2d 98, 104 n. 1 (D.Mass.1999).

to "fundamental constitutional questions" seems to me to give insufficient weight to the First Circuit's conclusion in *Goncalves* that habeas review extended to consideration of the BIA's refusal to consider a deportee for discretionary relief in violation of a statute. *See* 144 F.3d at 125. Although the decision in *Goncalves* was made under the transitional rules, the analysis regarding the scope of review did not rely on the statutory language of the amendments. Instead the court examined the language of the habeas statute.[5] *See id.* at 123. In so doing it concluded that "[t]he language of § 2241 itself does not contemplate a limitation of jurisdiction only to constitutional claims; instead, it contemplates challenges based on the 'Constitution or laws or treaties of the United States.'" *Id.* Thus, it was within the jurisdiction of the *Goncalves* court to determine if the retroactive application of the new statute was correct.

Based on the First Circuit's reasoning in *Goncalves,* this Court must respectfully disagree with Judge Keeton's conclusion in *Carranza.* It is the position of this Court that it has jurisdiction to hear "pure issues of law concerning the applicability of [certain of the new] statutory provisions" to individuals who committed their crimes prior to the enactment of the statute. *Goncalves,* 144 F.3d at 133. Thus, habeas review includes a determination of whether section 212(c) relief is available to Vasquez.

### B. *Personal Jurisdiction*

■ Even if this Court has subject matter jurisdiction, it may not have personal jurisdiction. Not surprisingly, this is the argument advanced by the government. The government contends that Vasquez's custodian is the INS District Director in Louisiana and consequently this Court

does not have personal jurisdiction over him. Vasquez counters that the Attorney General is his custodian, not the INS District Director in Louisiana, and as such personal jurisdiction lies in this district.[6]

On this point too there is as yet limited guidance from the First Circuit. In another unpublished opinion, the First Circuit declined to decide the issue of personal jurisdiction under a similar set of facts. *See Alvarez v. Reno,* No. 98–1099, slip op. (1st Cir. Feb. 6, 1998) (unpublished opinion). A review of the scant case law on this question indicates that, as in the area of subject matter jurisdiction, there is significant disagreement among the lower courts.

The gravamen of the dispute centers on the definition of custodian in the instance of an alien, taken into custody in Massachusetts by the INS and subsequently transported to Louisiana for deportation proceedings. The fact that Vasquez is not currently in Massachusetts does not determine the appropriate custodian. In *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), the Supreme Court determined that nothing in the habeas statute required the petitioner to be detained within the reviewing court's territorial jurisdiction. *See id.* at 495, 93 S.Ct. 1123. According to *Braden,* "the language of § 2241 requires nothing more than that the court issuing the writ have jurisdiction over the custodian." *Id.* Thus, the fact that Vasquez is detained in Louisiana does not preclude this Court from having personal jurisdiction over his custodian. *Braden* does not, however, determine exactly who is the custodian.

The government argues that the traditional notion of "custodian" in habeas cases

5. The examination of the language of the habeas statute follows logically from the analysis regarding whether the statute was repealed. A direct consequence of determining that the statute remains intact is that the language of the statute still has full effect absent a specific legislative mandate to the contrary.

6. Vasquez also includes Meissner and Farquharson as potential custodians. It is, however, only necessary here to address the question of whether the Attorney General is subject to personal jurisdiction.

means the person having day-to-day control over the individual. *See Yi v. Maugans,* 24 F.3d 500, 507 (3d Cir.1994). Generally, that person is the warden of the prison where the detainee is held. Consequently, according to the government, the INS Director in New Orleans, who has control over the aliens detained by the INS in Louisiana is the "custodian" for purposes of this case. All the cases cited by the government to support its position, however, occurred in the context of federal prisoners challenging their sentences, save one. In *Yi v. Maugans,* the petitioner attempted to obtain class certification for all Chinese aliens in exclusion proceedings. *See* 24 F.3d at 507. Class certification was denied for a variety of reasons, one being that the district court lacked jurisdiction over many of the class members and their custodians. *See id.* Neither the parties nor the court raised the issue of whether the correct custodian was named as respondent. Thus, at best, this case is inapposite.

There are a trifecta of cases from the Eastern District of New York that directly address the issue of personal jurisdiction in this context. This Court finds these cases persuasive. *See Pena–Rosario v. Reno,* 83 F.Supp.2d 349 (E.D.N.Y.2000); *Mojica v. Reno,* 970 F.Supp. 130 (E.D.N.Y. 1997); *Nwankwo v. Reno,* 828 F.Supp. 171 (E.D.N.Y.1993); *see also Yesil v. Reno,* 958 F.Supp. 828 (S.D.N.Y.1997). Each of these decisions ruled that the Attorney General was an appropriate custodian "because she could 'direct her subordinates to carry out any order directed to her to produce or release the petitioner.'" *Mojica,* 970 F.Supp. at 166 (quoting *Nwankwo,* 828 F.Supp. at 174). The reasoning is supported by the language of the Warrant of Removal/Deportation which provides "I, the undersigned officer of the United States, by the virtue of the power and authority vested in the Attorney General under the laws of the United States and by his or her direction, command you to take into custody and remove from the United States ...." Resp. Reply Mem. Ex. B.

Based on the language chosen by the INS, it is not unreasonable to infer that the Attorney General is the custodian.

The New York decisions also relied on the potential implications of the Attorney General's ability to choose the jurisdiction. "It is important to note that were the government correct that a habeas petition may be heard only where the petitioner is detained, then the Attorney General 'could seriously undermine the remedy of habeas corpus by detaining a large group of persons in one facility so that the resulting torrent of habeas corpus petitions would overwhelm' the local court." *Mojica,* 970 F.Supp. at 167 (quoting *Nwankwo,* 828 F.Supp. at 175). Although it is unlikely that the Attorney General acts with such a sinister intent, the potential effect of her decision relative to detention sites makes this supposition far from ridiculous. According to the Fifth Circuit, "the district and magistrate judges are toiling long and hard to process the torrent of habeas petitions flowing from the Oakdale facility," however, "the atypical and unanticipated volume ... is beyond the capability of the district court to process in a timely fashion." *Emejulu v. Immigration and Naturalization Serv.,* 989 F.2d 771, 772 (5th Cir.1993). Thus, practical issues of judicial economy and notions of justice also counsel that the Attorney General is the appropriate custodian.

In so ruling, this Court again respectfully acknowledges its disagreement with Judge Keeton. In an unpublished order, Judge Keeton explicitly stated that the New York decisions were "mistaken as a matter of law and policy." Resp. Supp. Mem. Ex. B. The court went on to state that "[t]he idea that an alien could file willy-nilly in any judicial district in the United States of his choosing would wreak havoc on the orderly administration of the immigration laws." *Id.* This Court must respectfully disagree. Establishing that the Attorney General is the custodian of the petitioner does not give detainees carte

blanche to file anywhere. A venue analysis would quickly disarm any potential abuses of the system. Moreover, it is impractical for a detainee to petition courts with which she has no connections. The facts in the New York cases and the facts before this Court indicate that all the petitioners had significant ties to their home communities. Thus, it is unlikely that the personal jurisdiction analysis adopted today will "wreak havoc on the orderly administration of the immigration laws."

Because the Attorney General is the custodian of Vasquez and is subject to service in the District of Massachusetts, this Court has personal jurisdiction. *See Braden*, 410 U.S. at 495, 93 S.Ct. 1123.

### C. *Venue*

The government is not yet out of procedural ammunition; it also asserts that the District of Massachusetts is not the appropriate venue for this matter. This is a compelling argument yet, like the questions of jurisdiction, it lacks substantive definition from the courts of appeals.

Venue refers to locality, the place where a lawsuit should be heard. It is often confused or combined with personal jurisdiction. They are two distinct concepts, however. The Supreme Court explained the difference in *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 84 L.Ed. 167 (1939):

> The jurisdiction of the federal courts—their power to adjudicate—is a grant of authority to them by Congress and thus beyond the scope of the litigants to confer. But the locality of a law suit—the place where judicial authority may be exercised—though defined by legislation relates to the convenience of litigants and as such is subject to their disposition.

The appropriate venue is usually guided by legislation. The habeas statute does not contain a specific venue provision in this instance. Thus this Court must look to "traditional venue considerations." *Braden*, 410 U.S. at 493, 93 S.Ct. 1123.

The Supreme Court addressed the appropriate venue pursuant to a habeas petition in *Braden*. *See id.* There, the petitioner was detained in an Alabama prison yet brought his habeas petition in the District Court for the Western District of Kentucky. The petition was based upon the denial of a speedy trial pursuant to a Kentucky indictment. *See id.* at 485–86, 93 S.Ct. 1123. After concluding that the Kentucky court had jurisdiction, the Supreme Court analyzed the issue of an appropriate forum. *See id.* at 493, 93 S.Ct. 1123. According to the Court:

> In terms of traditional venue considerations, the District Court for the Western District of Kentucky is almost surely the most desirable forum for the adjudication of the claim. It is in Kentucky, where all the material events took place, that the records and witnesses pertinent to petitioner's claim are likely to be found. And that forum is presumably no less convenient for the respondent and the Commonwealth of Kentucky than for the petitioner.

*Id.* at 493–94, 93 S.Ct. 1123.

In *Mojica*, Judge Weinstein relied on the language cited above when he concluded that the Eastern District of New York and not Louisiana was the proper forum to hear the petitioners' claims for relief. *See* 970 F.Supp. at 167. After citing to *Braden*, the court concluded:

> In the instant case, these considerations strongly militate in favor of adjudicating Mojica's habeas petition in the Eastern District of New York. Until his transfer from the INS' Varick Street detention center in New York, Mojica had never been in Louisiana. The crime for which he became deportable took place in the Eastern District of New York. The witnesses and evidence necessary to establish his eligibility for 212(c) relief are all located in New York.
>
> Mojica would be severely disadvantaged by having to bring a habeas proceeding in Louisiana since his attorneys

are located in New York and have expended extensive efforts on this matter in the Eastern District. The choice of forum could significantly affect Mojica's rights because the law varies from circuit to circuit, and as a resident of the Second Circuit for over twenty years, Mojica should have his case decided under Second Circuit law. There is also a possibility of backlog habeas petitions in Louisiana, which could result in Mojica's rights to habeas review being significantly delayed while he remains in detention in Louisiana, without realistic access to his attorneys or family.

*Id.* at 168 (citations omitted).

This is an attractive argument that appears to parallel the facts presented by Vasquez. It is not clear, however, that habeas petitions in removal cases fit as neatly into the *Braden* analysis as *Mojica* suggests. Both *Mojica* and the case here involve issues substantially more complex than did *Braden.* The petitioner in *Braden* was protesting the actions of the Commonwealth of Kentucky; thus the genesis of the controversy was clearly delineated. *See* 410 U.S. at 495, 93 S.Ct. 1123. While he was technically confined in Alabama, it was Kentucky's inaction that was interfering with his constitutional rights. *See id.* In reviewing the evolution of habeas jurisdiction, the Supreme Court noted that Congress has "explicitly recognized the substantial advantages of having these cases resolved in the court which originally imposed the confinement or in the court nearest the site of the underlying controversy." *Id.*

In *Mojica,* Judge Weinstein implicitly assumed that New York was either where the court that "originally imposed confinement" or the "the court nearest the site of the underlying controversy" was situated. Whether this is an accurate assessment depends on whether a court looks to the criminal convictions that led to deportation as the source of confinement or the underlying controversy *or* whether a court looks to the removal proceedings and the deci-

sion to deny section 212(c) relief as the bases of the claim. As noted in *Mojica,* the choice of forum has very real consequences for a petitioner. Here, the criminal convictions and original confinement occurred in Massachusetts, while the removal proceedings ensued in Louisiana.

The First Circuit has provided guidance, albeit limited and without precedential value, in the area of forum choice. *See Alvarez v. Reno,* No. 98–1099, slip op. at 1 (1st Cir. Feb. 6, 1998) (unpublished opinion). Like Vasquez, Alvarez sought habeas relief arguing that AEDPA section 440(d) did not apply retroactively and he should have access to a section 212(c) waiver. *See* Pet. for Writ of Habeas at 7–8 (Alvarez). The government moved to dismiss the petition based on improper venue and lack of personal jurisdiction. *See* Resp. Mem. of Law (Alvarez). Judge Keeton dismissed "for want of jurisdiction of this court to issue any form of relief requested." *Alvarez v. Reno,* No. 98–10186–NG, slip op. at 1 (D.Mass. Jan. 30, 1998). The court determined that the contacts with Massachusetts were too limited to provide a basis for jurisdiction. *See id.*

Alvarez immediately appealed and the First Circuit, in a one-paragraph, unpublished opinion, affirmed the district court decision "on narrower grounds." The court concluded that "even if the district court had personal jurisdiction over one or more of the petitioner's potential custodians . . .—a matter we do not now decide," the proper forum for the petition was the Western District of Louisiana. *Alvarez,* slip op. at 1. The result was based on the government's representation that the deportation proceedings were held in Oakdale, Louisiana. *See id.* "Consequently, absent exceptional circumstances—and we find none—the western district of Louisiana was the proper forum to file a habeas petition." *Id.*

The First Circuit's conclusion in *Alvarez* is consonant with the *Braden* analysis. Alvarez was seeking relief from the immigration judge's decision to apply section

440(d) retroactively thus making a section 212(c) waiver unavailable. Because the underlying controversy was the decision of the immigration judge in Louisiana, it was logical to assume that Louisiana was the appropriate venue. In contrast, if Alvarez had been appealing the underlying convictions that led to the removal order, the apt venue would have been Massachusetts. Based on this analysis, it appears that Louisiana is also the proper forum for the petition in this case.

The First Circuit did leave one avenue of redress open, however. The phrase "absent exceptional circumstances" suggests that the court envisaged a situation in which access to the Massachusetts District Court would be a necessity. Absent explicit guidance, it is left to this Court to further define "exceptional circumstances." This Court rules that an "exceptional circumstance" exists when a choice of forum would have a significant impact on the outcome. As Judge Weinstein noted, the law varies from circuit to circuit. Indeed, on the facts of this case, the Fifth Circuit has held that district courts do not even have jurisdiction to hear habeas petitions. Thus, if this Court was to dismiss Vasquez's petition for improper venue, it is a veritable certainty that his claim would not be heard in the district court. See Max–George, 205 F.3d at 198 (holding section 1252[a][2][C] precludes habeas jurisdiction).[7] Moreover, because of the jurisdictional limitation contained in section 1252(a)(2)(C), Vasquez also could not seek relief in the Fifth Circuit. See 8 U.S.C. § 1252(a)(2)(C) (providing "no court shall have jurisdiction to review any final order of deportation"). The government conceded as much at oral argument.

As the lack of meaningful review influenced the First Circuit's decision in Wallace regarding subject matter jurisdiction, 194 F.3d at 285, it stands to reason that it would have a similar impact on a venue analysis.

Laying venue in Massachusetts compels the Court to examine the merits of Vasquez's claims.

### D. Merits

Vasquez raises four issues in his habeas petition. The central argument of his petition, however, focuses on the retroactive application of section 440(d) and the availability of section 212(c) discretionary relief available to individuals convicted of crimes prior to the enactment of AEDPA and IIRIRA. Vasquez argues that he is eligible for relief under section 212(c) because his conviction occurred prior to the passage of the amendments. In essence, Vasquez asks this Court to revisit its conclusion in Mattis v. Reno, 44 F.Supp.2d 379 (D.Mass.1999), in which this Court declined to extend the holding in Goncalves to individuals who were convicted prior to the enactment of AEDPA and IIRIRA but not yet involved in deportation proceedings. In Mattis this Court concluded that petitioner was ineligible for section 212(c) relief because "the application of section 440(d) does not attach an additional consequence to Mattis' prior conduct nor does it impair a substantive right possessed by Mattis." Id.; accord United States v. Gonzalez, 202 F.3d 20, 26 (1st Cir.2000); Groccia v. Reno, 89 F.Supp.2d 127, 131 (D.Mass.2000)(Stearns, J.).

Subsequent to Mattis, the First Circuit decided Wallace, in which it held that section 440(d) did not apply to individuals who were in deportation proceedings prior to the enactment of the AEDPA and IRRIRA. While the temporal posture of that case differs significantly from Mattis and the case here, the narrow holding offers insight. See Wallace, 194 F.3d at 286. While the district court in Wallace took the view that whenever an alien pled guilty prior to AEDPA the waiver ban should not

---

**7.** In contrast, the petition by Alvarez was under the transitional rules and could have been heard in the Fifth Circuit. See Requena–Rod- riguez v. Pasquarell, 190 F.3d 299, 305 (5th Cir.1999).

apply, *see id.*, the First Circuit declined to adopt such a broad view. It left open the question of whether individuals, like Vasquez, convicted prior to the enactment but in deportation proceedings after its effective date were eligible for discretionary waivers. *See id.* at 287 ("It is unnecessary to decide such matters here since both Lemos and Wallace were in deportation proceedings prior to AEDPA.").

Without additional guidance from the First Circuit, Vasquez asks this Court to follow the reasoning of *Mojica* which is directly contrary to the reasoning in *Mattis*. In *Mojica*, Judge Weinstein determined that the right to apply for a waiver was a statutory right "which played a central role in decisions made by criminally accused lawful permanent residents." 970 F.Supp. at 178. Further, the court concluded that the retroactive application of the law resulted in unexpected, additional consequences for past behavior. *See id.* at 174. To support this proposition the court drew an analogy to the retroactive application of criminal statutes. "Any change from a discretionary system to a system of mandatory penalties for prior crimes is retroactive. That is because the individual is being deprived of the ability to bring equitable circumstances to bear on his case." *Id.* (citing *Warden, Lewisburg Penitentiary v. Marrero*, 416 U.S. 933, 94 S.Ct. 1930, 40 L.Ed.2d 284 [1974]).

This Court disagrees with this aspect of the analysis and outcome in *Mojica*. The reasoning in *Mattis* applies with equal force to the facts of this case. Vasquez did not enter removal proceedings until February 1999, long after the enactment of the AEDPA. Thus, section 440(d) is applicable and no discretionary relief is available pursuant to section 212(c).[8] Moreover,. a recent First Circuit decision affirms the conclusion in *Mattis* that retroactive application of section 440(d) does not act as an

additional consequence to criminal conduct. *See Gonzalez*, 202 F.3d at 25; *see also Groccia*, 89 F.Supp.2d at 131.

■ Vasquez's equal protection argument is equally unavailing. *See Mattis*, 44 F.Supp.2d at 385 n. 5 (noting that as of April 1, 1997 no discretionary relief available for either deportable or excludable aliens). In order for Vasquez to maintain his equal protection argument claim here, his deportation proceedings must have been pending on April 1, 1997. That is not the case here. Vasquez was not issued an Order to Show Cause until February 1999. In any event *Mattis* also held that Congress, by limiting section 440(d) restrictions to "deportable aliens," articulated a legitimate legislative purpose. *See id.* This reasoning was subsequently upheld by the First Circuit in *Almon v. Reno*, 192 F.3d 28, 32 (1st Cir.1999).

■ Vasquez's next argument, that he was not convicted of an "aggravated felony" lacks statutory support. Vasquez rests his protestation on the fact that although he was sentenced to eighteen months in jail, he was required to serve only six months. The aggravated felony definition applicable to Vasquez states "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment is at least one year." 8 U.S.C. § 1101(a)(43)(G). Read in isolation "term of imprisonment" could be deemed ambiguous; however, when read in conjunction with 8 U.S.C. § 1101(a)(48)(B) the meaning is indisputable. Section 1101(a)(48)(B) provides that "[a]ny reference to a term of imprisonment ... is deemed to include the period of incarceration or confinement ordered by a court of law." The fact that Vasquez only served six months of an eighteen-month

---

8. To the extent that the language of case law appears to distinguish between individuals who pled guilty, *see Wallace*, 24 F.Supp.2d at 110; *Mojica*, 970 F.Supp. at 175, and those who go to trial as a basis for the retroactive application of section 440(d), this Court must object. Such distinctions are without merit. Indeed, they could well unconstitutionally burden a defendant's Sixth Amendment right to trial by jury.

sentence is, therefore, without consequence.

Finally, Vasquez asks this Court to rule that the immigration judge abused his discretion by refusing to release him on bond. Whether or not this Court has jurisdiction to rule on such a discretionary decision is still a point of contention. *See Mendonca,* 1999 WL 1295834, at *1. Taking a cue from the First Circuit, there is no need to decide this particular issue. There is nothing in the record to suggest that the immigration judge abused his discretion in determining that Vasquez was a flight risk.

## IV. *Conclusion*

For these reasons, this Court ruled on April 18, 2000 that 8 U.S.C. § 1252 did not strip the district courts of habeas jurisdiction. Further, this Court ruled that the Attorney General is the proper custodian and is subject to the personal jurisdiction of this Court. Moreover, because of the lack of review available in either the district or appeals court in the Fifth Circuit, venue is proper. The petition for habeas was, however, dismissed on the merits because section 212(c) relief is unavailable to individuals convicted of prescribed offenses prior to the enactment of AEDPA and IIRIRA but not subject to removal proceedings until after April 1, 1997. On April 19, 2000, due to the complexity of the jurisdictional issues and this Court's uncertainty as to the correctness of the course it has adopted, the Court transferred the case to the First Circuit Court of Appeals pursuant to 28 U.S.C. § 1631. At that time the Court also granted Vasquez's request for a stay. The stay was limited, however, to four weeks or until a contrary order emerged from the First Circuit Court of Appeals.